Filed 2/9/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SHERYL KATHRYN LEIGHTON,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>ROCHELLE FORSTER,<br><br>     Defendant and Respondent. | A145601<br><br>(Alameda County<br>Super. Ct. No. RG12635752) |

**I.**

**INTRODUCTION**

Sheryl Leighton (appellant) sued Rochelle Forster (Rochelle)[1] for breach of an attorney fee contract and an account stated, seeking damages in excess of $114,000. In granting Rochelle summary judgment, the trial court found, among other things, that (1) an engagement letter appellant emailed to Rochelle's husband Bob was not a valid contract because it was never signed (see Bus. & Prof. Code, § 6148 (section 6148))[2]; and (2) any claim for payment of the reasonable value of appellant's services was barred by the two-year statute of limitations. (See Code Civ. Proc, § 339, subd. 1.)

Appellant contends there are triable issues of material fact regarding Rochelle's liability for appellant's unpaid attorney fees because she produced evidence that, before Bob passed away, appellant and Bob negotiated a fee arrangement that either satisfied the

---

[1] For clarity, we often refer to Rochelle and Bob Forster by their given names. No disrespect is intended.

[2] Unless otherwise stated, all statutory references are to the Business and Professions Code.

1

requirements of section 6148 or was exempt from those requirements. We affirm the judgment.

## II.

## STATEMENT OF FACTS

### A. The Underlying Legal Dispute

In 1984, Rochelle and Bob Forster executed an agreement with Bob's business associate Al Rheinheimer and Al's wife Sophie to purchase jointly a single family home in Berkeley (the Berkeley house). Rochelle did not like the idea of buying the Berkeley house with the Rheinheimers, but she agreed to the arrangement because Al convinced Bob that a joint purchase had financial and tax advantages, and Bob assured Rochelle they could buy out the Rheinheimers' interest after a couple of years. In the meantime, the agreement was that each couple would be responsible for half the Berkeley house expenses, and that the Forsters would reside in the house and pay rent to the Rheinheimers, who would collect all the money and pay the mortgage, taxes and insurance. In the late 1980's, the Forsters made overtures to buy out the Rheinheimers, but Al convinced them that it was not a good time to do that.

In 2002, Bob told Rochelle that Al Rheinheimer had committed identity theft against him. Bob made this discovery after his bank turned down a request to increase the credit line for his business. Al, who prepared Bob's tax returns, had used Bob's personal information to open three credit cards and incurred balances totaling approximately $50,000. Bob told Rochelle that when he confronted Al about the matter, Al admitted what he had done and immediately paid off the credit card balances. In light of this incident, the Forsters agreed they needed to buy out the Rheinheimers, but Al refused to cooperate.

In 2004, Rochelle learned about two decisions Bob had made which impeded the Forsters' efforts to buy out the Rheinheimers' interest in the Berkeley house. First, after the bank denied Bob's request to increase his business line of credit because of Al's identity theft, Bob borrowed $100,000 from Al. Second, on Al's advice, Bob had been writing checks for the Forsters' share of the monthly expenses for the Berkeley house to

2

two individuals other than Al, neither of whom the Forsters knew.[3] Rochelle was very upset by these facts, which made it difficult for her and Bob to discuss the Rheinheimers without arguing. She was also busy with her own job and raising a young son, so she took the position that it was Bob's responsibility to fix their problems with the Rheinheimers.

**B. Appellant's Contract Work for Robert James**

Meanwhile, sometime in 2004, a semi-retired attorney named Robert James agreed to help the Forsters resolve their dispute with the Rheinheimers. James was the Forsters' neighbor and Bob's good friend. There is no evidence in this record that James charged the Forsters for his personal legal assistance.

When James agreed to help the Forsters, he had a preexisting employment relationship with appellant, who worked for him as a contract attorney. Appellant's employment relationship with James was governed by a letter agreement drafted by appellant and signed by both James and appellant on February 14, 2002 (the 2002 Letter Agreement).

In the 2002 Letter Agreement, appellant agreed to provide James with "legal research and writing services" and such other services as they were to subsequently "agree upon from time to time." Appellant's terms included a billing rate of $75 per hour and a right to charge for unspecified out-of-pocket costs she incurred to complete assignments she received from James. Appellant agreed to issue invoices on the last date of the month unless James requested otherwise, and James agreed to pay these invoices within 15 days. In this regard, the 2002 Letter Agreement stated: "You will be responsible for payment of my invoices without regard to whether your clients pay you for the work I have performed and without regard to the outcome of any motion, trial, appeal, arbitration, mediation, settlement negotiation, or other proceeding or transaction."

---

[3] Rochelle and Bob kept separate bank accounts and they did not maintain a joint account of any kind.

The 2002 Letter Agreement also disclosed that appellant did not carry professional liability insurance and that her services to James did not include interacting with his clients. On this later point, appellant stated: "You may disclose to your clients that I am performing work for you on their behalf. You understand, however, that I will not engage in any verbal or written communications with your clients, including conference calls or meetings. Neither you nor your staff may give any client my telephone number, fax number, e-mail address, or mailing address or otherwise authorize a client to communicate directly with me."

Between October 2004 and April 2005, appellant issued monthly invoices to James for work she did for him on "*Forster v. Rheinheimer*." During that period, her monthly charges ranged from $238 (in October 2004) to $1,455 (in March 2005). All of these invoices were paid by Bob Forster.

Between November 2005 and March 2007, appellant submitted invoices to James for her work on the Forster case almost every month.[4] During this period, James paid appellant's September 2006 invoice for $3,459.50. All other payments toward these invoices were made by Bob Forster. During 2007, appellant's invoices were significantly higher than in prior months, she began submitting more than one invoice per month, and she started carrying a balance forward reflecting prior unpaid invoices.

An invoice dated March 2, 2007, appears to be the last bill that appellant submitted to James for her work on the "*Forster*" matter. The total amount due was $8,953.31. Of that total, $3,045 was for hourly services during the last two weeks of February, which were charged at a rate of $105 per hour; $55.81 was for out-of-pocket costs; and $5,852.50 was reported as a balance forward from a February 2007 invoice.

---

[4] If appellant issued invoices between May and October 2005, they are not in the record.

4

## C. Appellant's Agreement to Work for Bob

On March 6, 2007, Bob sent an email to appellant letting her know that James was in the hospital. Thereafter, the two exchanged several emails about the status of James's health.

In a March 12, 2007 email, appellant told Bob that she had visited James and he was feeling better, but that he was planning to ask a trial attorney to take over Bob's case. Appellant offered to assist Bob in the meantime and also shared her concern that "litigation will be disproportionally expensive and stressful for you and your wife in relation to what you get in the end." Appellant offered to meet with Bob and Rochelle to talk about finding a way to meet their goals short of litigation.

Later that day, Bob sent an email to appellant letting her know that James had taken a bad turn and was not expected to live for more than a few days. Bob thanked appellant for her offer of help and said that he wanted to stick to the current plan, which was to serve a complaint and discovery with the hope of prompting a quick settlement. If that did not work, Bob would ask an attorney who James had recommended to represent him at trial. Acknowledging appellant's point that a trial was not in his best interest, Bob asked: "If it is OK with you I will probably ask for your further assistance to steer me to the right places, saying the right things, with the right documents. . . ."

James died on March 13, 2007. On March 15, 2007, Bob wrote appellant a check for $5,852.50, the amount of the balance forward recorded on appellant's March 2007 invoice to James.

In April 2007, appellant began sending her invoices directly to Bob. An invoice dated April 2, 2007, reflected current charges for the month of March totaling $4,203.50, plus a balance due from appellant's last invoice to James in the amount of $3,100.81. On April 5, 2007, Bob wrote a check to appellant for $3,100.81. That same day, appellant and Bob met each other for the first time. Appellant followed up with an email in which she stated that it was a pleasure to finally meet in person; that she looked forward to working with Bob; and that she remained optimistic about a settlement "in a way that meets your goals."

5

On April 12, 2007, Bob sent appellant an email which stated: "If you are willing, I would like you to represent my wife and me regarding the Rheinheimer matter in the same capacity as now and also to be our negotiator." Bob said that his strategy was to "hit them as hard as possible," and then offer a reasonable compromise, but he asked appellant if there was a better strategy. Bob also proposed a payment schedule for appellant's "past unpaid fees and future fees," pursuant to which he would pay appellant $2000 on the first of every month until the fee was paid.

In an April 13, 2007 email, appellant told Bob: "I would like to continue to help you to the extent of my competence. Unfortunately, I am not in a position to carry accounts, particularly when the work is accelerating." Appellant said that she would get back to Bob with "some ideas for how we can make this situation work for both of us." Two days later, there was another email exchange during which Bob said he made arrangements to pay appellant's invoices in full 15 days after receipt, which he hoped was "OK because we want you to continue helping us." Appellant responded by thanking Bob for arranging to pay her invoices, stating that she would proceed with work on his case, and telling him that she would "draw up an engagement letter that fits our unique situation."

Meanwhile, appellant continued to generate fees on Bob's case and send her invoices directly to Bob. Appellant's April 15, 2007 invoice was for $5,958.60, which included a balance forward of $4,203.50. Appellant's May 1, 2007 invoice was for $13,657.39, which included a balance forward of $5,958.60, the total amount of appellant's April 15 invoice.

### D. The May 2007 Engagement Letter

On May 2, 2007, appellant sent an email to Bob, in which she stated: "The attached letter states my understanding of our agreement concerning my work for you. I apologize (again) for my delay in getting this to you. Please let me know if you have questions. If the letter is fine 'as is,' you don't need to sign it and return it. Just let me know by email that you agree with it."

6

According to appellant, the document she attached to her May 2 email constitutes the written attorney fee agreement that became the subject of this litigation, which she filed against Rochelle several years after Bob passed away. The document in question is an unsigned letter from appellant, addressed to Bob and Rochelle Forster, dated May 2, 2007, and described in a subject line as "**Terms of Engagement.**" (Original boldface.) We refer to this alleged agreement as the May 2007 Engagement Letter.

The May 2007 Engagement Letter begins with these statements: "I am pleased to have the opportunity to help you resolve your claims against the Rheinheimers. This letter will confirm the terms on which I am providing legal services to you." In a paragraph addressing appellant's "Scope of Work," appellant stated: "You are currently representing yourselves in the litigation with the Rheinheimers. I will do my best to advise you, prepare documents for you, file and serve documents for you, and help you plan strategies in both of the pending cases." Appellant went on to state that she would also negotiate with opposing counsel "at a time and in a manner that we agree will be in your best interests." Appellant then stated: "You have authorized me to work the number of hours that may be necessary, in my professional judgment, to plan effective strategy and to produce work that is reasonably calculated to accomplish your overall goals in the litigation. You understand that a significant amount of research and other preparatory work will be necessary to place you in a positive negotiating position and to prevent unnecessary problems and expenses as the cases proceed."

Regarding appellant's background, the May 2007 Engagement Letter disclosed that appellant had no trial experience; her litigation experience was limited to assisting experienced trial counsel "behind the scenes"; she had never conducted a deposition; and she had limited experience with discovery. "Accordingly," appellant stated, "you understand that I cannot serve as your counsel of record and that it would not likely be in your best interests to have me manage the cases if they move forward to trial." Appellant offered to help locate experienced trial counsel, but stated that her understanding was that the Forsters had decided to proceed "solely with my assistance" until the completion of some discovery and settlement negotiations.

7

According to the May 2007 Engagement Letter, appellant intended to bill the Forsters $105 per hour for her services, would not charge them for "general overhead expenses," but would bill them for the "actual amount of costs" incurred while doing work for them, and would occasionally ask them to pay some out-of-pocket costs directly.

The May 2007 Engagement Letter stated that appellant would issue an invoice as of the last day of each calendar month pursuant to the following "*Payment Terms*": "Payment of my invoice will be due 15 days from the date of the invoice. I do not provide any services on a contingency-fee basis. Therefore, you will be responsible for payment of my invoices without regard to the outcome of any . . . proceeding or transaction. You understand that I am not in a financial position to carry accounts for anyone. Accordingly, if you anticipate that you may encounter difficultly paying for any of my work on time, it will be important to advise me promptly so that we can make alternate arrangements, which may include retaining another attorney or firm to take over my work." (Original italics.)

In the last paragraph of the May 2007 Engagement Letter, appellant stated: "If the above terms are consistent with your understanding, please sign a copy of this letter and return it to me." However, as noted above, the May 2, 2007 email that appellant allegedly used to forward the May 2007 Engagement Letter to Bob expressly stated that Bob did not need to sign or return the document to appellant. All appellant asked was that Bob let her know by email if he agreed with it.

On May 2, 2007, Bob sent the following email message to appellant: "Thanks, we will review this. [¶] Your April 2nd invoice check was mailed this afternoon along with the Western Attorney Service Bill. [¶] Bob."

Appellant's June 8, 2007 invoice to Bob was for $12,128.85. Charges for the month of May totaled $10,338.75. The invoice reflected that Bob had made three payments toward appellant's May 2007 invoice, but that there was still a balance forward of almost $1,800.

8

On June 18, 2007, Bob sent appellant an email which stated, in pertinent part: "When I made arrangements to pay you every month I was thinking in the $5K range. I am unable to pay the entire bill in June. I do not want you to stop working, but I am unable to pay these kinds of amounts in 15 days. [¶] Is it possible to pay you $5K each month? I know you said $2K was not good but $5K is a substantial amount."

On June 19, 2007, appellant sent Bob an email which said that "$5,000 per month will work fine for me," and then discussed other matters pertaining to Bob's case. Later that day, Bob sent an email reply which stated "Thanks for accepting the deal. I am stressing much less." In an email sent the following day, appellant said: "Bob, please don't stress over this. I am very aware of how financially burdensome litigation can be for families, particularly when taking a proactive approach at the beginning to establish an advantageous settlement position. I am happy to accommodate you as long as I can stay afloat."

### E.  Appellant's Fees from July 2007 Until Bob's Death in May 2008

From July 2007 until May 2008, appellant generated invoices for her work on the "Rheinheimer" matter on a monthly basis. During this period, all of appellant's invoices were addressed to Bob. The July 2007 invoice reflected a total amount due of $8,278.50. Every month that total amount increased, and every invoice reflected a balance forward. The May 2008 invoice reflected a total amount due of $101,201.88.

During most of this period, Bob was terminally ill. He was diagnosed with liver cancer in October 2007 and died on May 17, 2008. According to Rochelle, Bob's physical and mental condition deteriorated quickly. He and Rochelle were also very worried about the effect of Bob's illness on their 14-year-old son. In Rochelle's opinion, by January 2008, Bob could no longer manage his daily affairs and he did not "understand what was going on in the Rheinheimer litigation, what [appellant] was doing[,] or what he should do about it." Rochelle was not thinking about the Rheinheimer litigation either; her "focus was on Bob's medical condition and [their] son."

9

During this period, Rochelle wrote two checks to appellant from her own account, a May 26, 2007 check for $4,000, and a March 11, 2008 check for $3,000. After appellant filed this lawsuit, Rochelle could not recall writing these checks. But, she acknowledged that she and Bob had an understanding that if Bob did not have enough money to pay a bill for his business, or for any reason, and the bill needed to be paid immediately, she would pay it from her separate account.

During this period, Rochelle also signed two "Notice of Limited Scope Representation" forms which appellant forwarded to her by email on November 1, 2007, the month after Bob received his terminal diagnosis. In one of the emails, appellant stated: "Hi Shelly[.] If you and I sign the attached form, I can file it with the court and do some of the things that Bob has been doing without involving him so much. My goal is to relieve him of stress as much as we can so that he can heal faster. . . . I will email you a similar form for the other case in a few minutes."

On November 5, 2007, appellant filed two "Notice[s] of Limited Scope Representation" signed by Rochelle on May 1, 2007. On these forms, appellant provided the following description of the nature and duration of her representation: "discovery, motions, case management matters, and other pretrial proceedings until Robert and Rochelle Forster retain trial counsel. Robert and Rochelle Forster intend to call [appellant] as a percipient witness at trial in this case and the related case . . . . Accordingly, the Forsters and [appellant] have agreed that she will not provide any legal representation in this case that would prevent her from doing so."

In a November 1, 2007 email to Bob, appellant stated that she was sending him some forms, which were the same as the forms she sent to Rochelle except that one set had Rochelle's name and the other had Bob's name as the party appointing appellant as their attorney. We find no evidence in this record that Bob signed the forms that were prepared for him or that his forms were filed with the court.

**F. Appellant's Efforts to Collect Fees from Rochelle**

As noted, Bob died on May 17, 2008. On June 3, appellant sent Rochelle an email which began as follows: "I have not received any payment on my outstanding fees for

two months. Bob fell behind quite some time ago, but he agreed to pay me at least $5,000 a month and more when he could. I know you are probably not aware of all this, and I have not wanted to bother you unnecessarily during this difficult time. Unfortunately, it has become an emergency for me. . . ." Appellant went on to explain that she had been unable to pay her rent or work expenses and that she also needed to pay the process server in order to serve a pleading in the Rheinheimer litigation before a court imposed deadline. Appellant stated that she needed a check from Rochelle for "at least $12,000 by Thursday at the latest to cover the April and May payments plus $2,000 for the process servers."

On June 5, 2008, Rochelle sent the following email message to appellant: "I am sorry if you feel that I am blaming you. That is certainly not my intent. [¶] These costs seem exorbitant to me. [¶] As far as overly compassionate, [I] was unaware of an outstanding balance for this amount. And it has only been 2 weeks since Bob's funeral. I need some time to try to make heads or tails of all my situation now."

In the early morning of June 6, 2008, appellant sent an email to Rochelle that opened with this statement: "Shelly, if you don't want to pay legal fees and costs, I don't know how you are going to defend yourself against the Rheinheimers' demands." Appellant suggested Rochelle might have a friend "like Bob James who would take the case for free," but cautioned Rochelle to find someone who "would have the perspective and dogged determination that is required to overcome the Rheinheimers' abusive tactics."

In her June 6 email, appellant told Rochelle: "I have been working for you without pay since last October, while incurring significant out-of-pocket costs on your behalf. . . . The result is that I have personally been paying to work for you since sometime in October. So has [my employee]. Neither of us is in a financial position to continue to do that." Appellant opined that Rochelle could still obtain a favorable outcome if the case was managed correctly, stating: "We created a great deal of momentum in the last three months by following the big-push, turn-up-the-heat strategy that Bob and I discussed in

11

February. However, that edge will be lost if you do not continue to pursue your claims actively and aggressively."

In her June 6 email, appellant said that she would drop off a packet of documents for Rochelle, which would include "copies of our fee agreements and all itemized invoices covering my work on your case through May 31, 2008," and that if Rochelle reviewed these documents she would see "why the case is costing as much as it is." Appellant admitted that she had stopped mailing her "time and cost itemizations" to Bob after early March because, appellant said, "he told me that he was not opening any envelopes from me . . . ." Appellant asked Rochelle to leave a check in her front door grate for appellant to pick up when she dropped off the packet of documents.

Appellant closed her June 6 email by telling Rochelle that she would prepare the case files for Rochelle's trial counsel. She urged Rochelle to "find someone to take over as soon as possible" because of an approaching deadline for serving another version of the complaint. She also told Rochelle that she did not have the money to hire a process server so Rochelle and her new lawyer would either need to get the service completed or obtain an extension from the court.

On June 6, 2008, appellant delivered an envelope of documents to Rochelle's home and picked up a $5,000 check that Rochelle had left for her. On the evening of June 10, Rochelle sent appellant an email about the packet of documents. Rochelle told appellant that she was "more in shock now than ever before, if that is possible, since Bob's death." In reference to appellant's June 3 email, Rochelle stated that appellant was correct in stating that Rochelle was "unaware of any of this" and added that she had "never seen any of these documents before." A few minutes later, Rochelle sent appellant another email. She began by asking: "What are the Rheinheimers' demands?" Then Rochelle addressed the contention in appellant's June 6 email that she had not been paid since October, stating: "I know that Bob was paying you every month, because he asked me to pay all our bills. When I questioned him as to why he did not have any money to pay basic bills, he told me that he was paying you his whole paycheck every month." In closing, Rochelle stated: "My distress is extreme at the moment."

12

On June 14, 2008, appellant went to Rochelle's home and picked up a check for $2,000 that Rochelle provided in order to pay a process server to serve a fifth amended complaint in the Rheinheimer litigation.

In a June 25, 2008 email, appellant advised Rochelle that she had not received a "$2,500 payment that you promised to make on June 23rd." Appellant proposed another payment schedule, which was "the best" she could offer Rochelle, and stated that if Rochelle was not going to make these payments, appellant would withdraw from her case.

On June 30, 2008, appellant filed an application in the Rheinheimer cases to be relieved as the Forsters' attorney upon completion of her limited scope representation. In that application, appellant stated that she was retained to provide the Forsters with legal assistance "during early stage of litigation and until determination by me that experienced trial counsel should be retained." Appellant stated that if trial counsel was not retained before her application was granted, Rochelle would "resume self-representation until she has selected and retained new counsel."

In a July 1, 2008 email to appellant, Rochelle acknowledged that she "did say" that she would send appellant $2,500, but after discovering that appellant's phone had been disconnected she was unsure what address to use.

On July 1, 2008, appellant issued her first invoice directly to Rochelle (the July 2008 Invoice). Appellant charged Rochelle $2,551.50 for legal services and an additional $435.09 for "out-of-pocket" costs incurred during the month of June. The July 2008 invoice also reflected a balance forward of $118,878.91, unspecified payments totaling $7,000, and a total amount due of $114,865.50.

In a July 6, 2008 email, appellant advised Rochelle that her phone and Internet services were terminated because she could not pay for them, but that her mailing address would be good through August, and that "[o]bviously, I am not in a position to do one more thing for you."

On July 15, 2008, Rochelle filed an objection to appellant's application to withdraw from the Rheinheimer cases. Rochelle stated that appellant had agreed to

13

represent the Forsters until they retained trial counsel; that Bob had recently died and she needed time to find new counsel; and that she would need appellant's help in order to respond to upcoming deadlines in the cases.

On August 19, 2008, appellant's application to be relieved as the Fosters' limited scope attorney was granted.

### G. Rochelle's New Attorney

In September 2008, Rochelle employed her current counsel Jeff Pollack to assist her with the Rheinheimer litigation. Litigation was stayed while the cases were sent to mediation. In November 2009, Rochelle became the sole owner of the Berkeley house. The following month both Rheinheimer cases were dismissed.

### H. Appellant's Complaint

On June 21, 2012, appellant filed a complaint against Rochelle for breach of a written attorney fee contract and an account stated. Appellant sought damages in the amount of $114,865.50 for her unpaid attorney services, and an additional amount sufficient to satisfy a money judgment that was allegedly entered against her for failing to pay a $772.99 debt she incurred on Rochelle's behalf.

Both causes of action were supported by the following general allegations: From September 1, 2004, until August 19, 2008, appellant performed legal services for Rochelle relating to disputes between Rochelle and the former co-owners of her residence. During this period, appellant used her own money to pay Rochelle's account and incurred obligations to third parties on Rochelle's behalf. Appellant's services and costs were itemized in periodic invoices. Appellant's "limited-scope representation" of Rochelle terminated by court order on August 19, 2008.

In support of her first cause of action for breach of contract, appellant alleged the following additional facts: the May 2007 Engagement Letter constitutes a written attorney fee contract; appellant emailed a copy of this contract to Rochelle's residence on May 2, 2007; and "receipt thereof [was] promptly acknowledged by an e-mail reply on [Rochelle's] behalf." All services appellant rendered to Rochelle pursuant to the written contract were "of the same general kind" as those appellant performed for Rochelle

14

before the contract was executed. In July 2007, appellant "reluctantly" agreed to accept monthly payments of $5,000 for her legal services. Thereafter, in June or July 2008, Rochelle breached the fee contract when she stopped making "her agreed partial payments on the balance due for plaintiff's services." In August 2008, Rochelle committed another breach by refusing to directly pay a $722.99 bill that appellant had incurred on her behalf.

In her second cause of action for an account stated, appellant relied on her general allegations without incorporating the allegations in her first cause of action, and then alleged the following facts: The July 2008 Invoice constituted an account of appellant's services to Rochelle, which reflected an unpaid balance of $114,865.50. After this "account was stated," appellant made repeated demands for payment; Rochelle repeatedly promised to pay this account; and Rochelle repeatedly requested further services from appellant. But, appellant alleged, Rochelle never paid any part of the $114,865.50 balance.

## I. The Summary Judgment Ruling

In November 2013, Rochelle filed a motion for summary judgment on the grounds that (1) the November 2007 Engagement Letter and the July 2008 Invoice were not enforceable attorney fee contracts because they did not comply with the requirements of section 6148; (2) Rochelle did not consent to the attorney services appellant allegedly performed; and (3) any quantum meruit claim for appellant's work was barred by the two-year statute of limitations. (See Code Civ. Proc., § 339, subd.1.)

In opposing summary judgment, appellant took the position that there were triable issues of fact regarding the existence of a written attorney fee contract between herself and Rochelle which was subject to the four-year statute of limitation applicable to an action upon an instrument in writing. (See Code Civ. Proc., § 337, subd. 1.)

On April 23, 2015, the trial court filed an order granting Rochelle's motion for summary judgment. The court found that the May 2007 Engagement Letter did not constitute an enforceable attorney fee contract because it was not signed by any party as required by section 6148, and "the facts here do not support a finding as a matter of law

15

that an exception to Section 6148(a) applies." Thus, to the extent appellant rendered legal services to Rochelle that had not been paid, appellant's recourse was a common count for quantum meruit, which was subject to a two-year statute of limitations. (Citing *Iverson, Yoakum, Papiano & Hatch v. Berwald* (1999) 76 Cal.App.4th 990, 996 (*Iverson*).) However, the court found that appellant's complaint was filed more than three years after the termination of her services to Rochelle.

By the same token, the court found that the absence of an enforceable written contract was fatal to appellant's second cause of action for an account stated based on an account in writing. (See Code Civ. Proc. § 337, subd. 2(2).) The court reasoned that it would be anomalous to find that a writing which violates section 6148 is nevertheless sufficient to support a cause of action for an account stated based on an account in writing. (Citing *Iverson*, *supra*, 76 Cal.App.4th at p. 997.)

## III.

## DISCUSSION

### A.  Standard of Review and Issues on Appeal

"We review a summary judgment ruling de novo to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. [Citation.]" (*Bjork v. State Farm Fire & Casualty Co.* (2007) 157 Cal.App.4th 1, 5-6; see also *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720.) "Material facts are those that relate to the issues in the case as framed by the pleadings. [Citation.] There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. [Citation.]" (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 859-860.)

In the present case, summary judgment was sought and granted based on evidence establishing that appellant's services are not covered by a written fee agreement and any claim based on an obligation not founded on a writing is barred by the statute of limitations. Therefore, in conducting our de novo review, we divide our analysis into two

16

parts: (1) whether a written fee agreement covers appellant's fees; and (2) whether appellant may hold Rochelle liable for her fees absent a written agreement.

### B. The Evidence Establishes There Was No Written Fee Contract

#### 1. Section 6148

Section 6148 is one of three related statutes governing fee contracts between lawyers and their clients. (See §§ 6146-6148; *Arnall v. Superior Court* (2010) 190 Cal.App.4th 360.) Section 6146 restricts the use of contingency fee agreements in medical malpractice actions; section 6147 regulates the form and content of contingency fee agreements outside the medical malpractice context; and section 6148 applies to fee agreements that are not governed by section 6147, with some specified exceptions. (*Ibid*.)

The Legislature enacted these statutes "[i]n order to protect clients and to assure fee agreements are fair and understood by clients." (*Alderman v. Hamilton* (1988) 205 Cal.App.3d 1033, 1037 (*Alderman*).) These statutes "operate to ensure that clients are informed of and agree to the terms by which the attorneys who represent them will be compensated." (*Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 460 (*Huskinson*).)

For fee contracts governed by section 6148, requirements regarding form and content are set forth in subdivision (a) (section 6148(a)), which states: "In any case not coming within Section 6147 in which it is reasonably foreseeable that total expense to a client, including attorney fees, will exceed one thousand dollars ($1,000), the contract for services in the case shall be in writing. At the time the contract is entered into, the attorney shall provide a duplicate copy of the contract signed by both the attorney and the client, or the client's guardian or representative, to the client or to the client's guardian or representative. The written contract shall contain all of the following: [¶] (1) Any basis of compensation including, but not limited to, hourly rates, statutory fees or flat fees, and other standard rates, fees, and charges applicable to the case. [¶] (2) The general nature of the legal services to be provided to the client. [¶] (3) The respective responsibilities of the attorney and the client as to the performance of the contract."

17

Subdivision (c) of section 6148 (section 6148(c)) further provides: "Failure to comply with any provision of this section renders the agreement voidable at the option of the client, and the attorney shall, upon the agreement being voided, be entitled to collect a reasonable fee."

Section 6148, subdivision (d) (section 6148(d)) describes four discrete situations that are outside the scope of section 6148, two of which are relevant to our analysis in this case. The pertinent provisions of section 6148(d) state: "This section shall not apply to any of the following: . . . [¶] [¶] (2) An arrangement as to the fee implied by the fact that the attorney's services are of the same general kind as previously rendered to and paid for by the client. [¶] (3) If the client knowingly states in writing, after full disclosure of this section, that a writing concerning fees is not required."

### 2. The Alleged Agreement Violates section 6148(a)

During the summary judgment proceedings, appellant expressly admitted the following facts: (1) On May 2, 2007, it was reasonably foreseeable that appellant's attorney fees for assisting the Forsters with the Rheinheimer litigation would exceed $1,000; (2) Bob never signed the May 2007 Engagement Letter; (3) Rochelle never signed the May 2007 Engagement Letter; (4) appellant never signed the May 2007 Engagement Letter; (5) appellant told Bob he did not have to sign the May 2007 Engagement Letter; and (6) appellant never asked Rochelle to sign the May 2007 Engagement Letter.

These concessions, which are all compelled by undisputed evidence, conclusively establish that the May 2007 Engagement Letter does not satisfy the mandatory requirements set forth in section 6148(a).

In this court, appellant characterizes her failure to comply with section 6148(a) as a "technicality," reasoning that "the agreement was accepted electronically instead of by physical signatures." Because appellant incorporates this premise into several arguments designed to excuse her from complying with section 6148, we address its two primary flaws.

18

First, the fact that an alleged attorney fee contract has not been signed by anyone does not constitute a technicality, but a material failure to comply with a crucial statutory requirement. As noted at the outset of our discussion, section 6148 belongs to a set of prophylactic statutes designed to assure that fee agreements are fair to the client by ensuring that the client is informed about and agrees to the terms by which the attorney who will represent him or her will be compensated. (*Alderman*, *supra,* 205 Cal.App.3d at p. 1035; *Huskinson*, *supra*, 32 Cal.4th at p. 460.) When an alleged agreement has not been signed by anyone, we are left to speculate about the client's understanding of the situation. Indeed, that is precisely the situation here.

Second, even if an electronic acceptance of an attorney fee agreement could be construed as substantial compliance with section 6148(a), the May 2007 Engagement Letter was not accepted electronically. Undisputed evidence establishes that Rochelle, the only "client" alleged in the complaint, never accepted the May 2007 Engagement Letter, either electronically or in any other way. In a declaration filed below, Rochelle stated that she was not aware of the existence of this document until she reviewed the packet that appellant delivered to her on June 6, 2008. This sworn statement is not only undisputed, it is corroborated by the admission that appellant never asked Rochelle to sign the May 2007 Engagement Letter, and by statements in appellant's June 2008 emails acknowledging that Rochelle was "probably not aware of all this" and assuring Rochelle that her packet of attorney fee agreements and invoices would explain why appellant was asking Rochelle to pay her so much money.

Appellant spends considerable time arguing that Bob was Rochelle's representative within the meaning of section 6148(a) because he was her agent. We do not address the merits of these arguments because they rest on appellant's unsupported premise that the May 2007 Engagement Letter was "accepted electronically" by Bob. Without any analysis, appellant erroneously assumes that Bob's May 2, 2007 email was an acceptance of the alleged contract. Preliminarily we note that the copy of this email that appears in the record reflects that it was sent a few minutes *before* appellant forwarded the May 2007 Engagement Letter to Bob. Assuming there is some explanation

19

for this time discrepancy, all Bob said in his email was that "we will review this," without even clarifying what "this" was. Thus, factually and legally, this email did not constitute an acceptance of an attorney fee contract.

Aside from the May 2, 2007 email exchange between Bob and appellant, there is no evidence that anyone ever discussed appellant's May 2007 Engagement Letter until after appellant filed this lawsuit. In her June 6, 2008 email to Rochelle, appellant alluded to attorney fee contracts generally, but there is no evidence or even an allegation that appellant ever discussed the May 2007 Engagement Letter with Rochelle.

Thus, it is not necessary for us to decide whether an email or some other concrete evidence short of a fully executed contract satisfies the requirements of section 6148(a). The summary judgment evidence establishes that, as a matter of law, the May 2007 Engagement Letter does not substantially comply with section 6148(a).

As noted above, failure to comply with section 6148(a) "renders the [alleged] agreement voidable at the option of the client . . . ." (§ 6148(c).) Appellant takes the position that even if the May 2007 Engagement Letter was voidable at one time, it was no longer voidable by Rochelle at the time that appellant issued the July 2008 invoice because all of the fees covered by that invoice were incurred after appellant fully complied with section 6148(a). In taking this position, appellant argues that: (1) the May 2007 Engagement Letter satisfies section 6148(a) "in all respects other than physical signatures"; (2) Rochelle and appellant both signed the November 2007 Notices of Limited Scope Representation, which expressly confirmed their "agreement" that appellant represented Rochelle; and therefore (3) the "contract documentation between [appellant] and Rochelle, taken together, satisfied all requirements of section 6148, subdivision (a), including physical signatures, as of November 1, 2007."

This argument ignores the substantive distinction between an agreement to retain an attorney and an agreement about what to pay an attorney. On their face, the Notices of Limited Scope Representation have nothing to do with the question whether the May 2007 Engagement Letter constitutes a valid attorney fee contract. Furthermore, undisputed evidence shows that appellant secured Rochelle's signature on the Notices of

20

Limited Scope Representation by assuring her that their *only purpose* was to allow appellant to relieve some of Bob's stress so that he could "heal faster."

In any event, section 6148(a) expressly states that "[a]t the time the contract is entered into, the attorney shall provide a duplicate copy of the contract signed by both the attorney and the client . . . ." Thus, this statute precludes appellant from using a document executed more than a year after the date of her alleged attorney fee contract as proof that the agreement was executed in the first place.[5]

### 3. *The Alleged Agreements Void Under section 6148(c)*

The summary judgment evidence shows that Rochelle was not aware that the May 2007 Engagement Letter existed until June 6, 2008, when appellant delivered a copy of that unsigned document to Rochelle's house. Less than a month later, without ever discussing the alleged contract with Rochelle, appellant issued her first and only invoice to Rochelle, the July 2008 Invoice demanding a payment of $114,865.50 for fees that were allegedly authorized by the May 2007 Engagement Letter. Thereafter, Rochelle did not sign or otherwise accept the May 2007 Engagement Letter or pay the July 2008 Invoice. Thus, the record affirmatively demonstrates that Rochelle repudiated the May 2007 Engagement Letter and the July 2008 Invoice. With these acts, Rochelle exercised her option under section 6148(c) and voided the alleged attorney fee contract.

Appellant argues that Rochelle waived her right to dispute the validity of the May 2007 "written agreement" because she accepted appellant's services for several years without giving appellant any "indication" that she wanted appellant to stop working, or that she intended to rescind the agreement. This argument is logically flawed and factually erroneous because appellant conflates two distinct issues; the question here is

---

[5] Appellant's attempt to piece together a viable attorney fee contract also flies in the face of other basic rules governing her profession. "Attorney fee agreements are evaluated at the time of their making [citation] and must be fair, reasonable and fully explained to the client. (Rules Prof. Conduct, rule 2-107; cf. *Hawk v. State Bar* (1988) 45 Cal.3d 589, 601 [].) Such contracts are strictly construed against the attorney. (*Bennett v. Potter* (1919) 180 Cal. 736, 740 []; *Lane v. Wilkins* (1964) 229 Cal.App.2d 315, 323 [].)" (*Alderman*, *supra*, 205 Cal.App.3d at p. 1037.)

21

not whether there is evidence of an implied agreement or equitable obligation to pay appellant's fees, but rather whether the May 2007 Engagement Letter constitutes a *written* fee contract under section 6148.

Furthermore, appellant's waiver theory is foreclosed by section 6148(d)(3), which expressly addresses how a client waives her rights under section 6148 by stating: "This section shall not apply . . . [i]f the client knowingly states in writing, after full disclosure of this section, that a writing concerning fees is not required." (§ 6148(d)(3).) Here, there is no evidence that appellant ever told Rochelle about the requirements of section 6148, or that Rochelle ever knowingly stated in writing that "a writing concerning fees is not required."

In another version of the same basic argument, appellant contends that Rochelle did not attempt to exercise her option under section 6148(c) until it was too late to do so because her "purported notice of rescission" of the alleged agreement was untimely and therefore ineffective. As support for this theory, appellant contends that "it is undisputed that Rochelle made no attempt to rescind the May 2, 2007 written agreement until her attorney gave notice of rescission for her in her demurrer papers in this action—on January 2, 2013."

Appellant cites no authority for grafting rescission requirements onto section 6148. She also mischaracterizes the actions of Rochelle's current attorney as attempting to effectuate a rescission. In a January 2013 brief filed in support of Rochelle's demurrer, counsel argued that Rochelle had a right under section 6148(c) to declare that the May 2007 Engagement Letter was void and that she was exercising that right.

It appears that appellant (and perhaps Rochelle's counsel as well) assumes that a client cannot exercise her option to void an attorney fee agreement under section 6148(c) unless or until she makes an express declaration to that effect. However, the parties do not cite any authority imposing such a requirement. To the contrary, in *Fergus v. Songer* (2007) 150 Cal.App.4th 552, 570, the court found that an unsigned letter agreement that failed to comply with the requirements of section 6147 was implicitly voided by the client. Under the factual circumstances presented here—including that the writing was

never signed, and Rochelle did not even see the document until after the fees were allegedly incurred—Rochelle implicitly voided the May 2007 Engagement Letter by refusing to pay the July 2008 Invoice.

### 4. There Is No Implied-in-Fact Agreement Under section 6148(d)

Appellant contends she produced evidence that section 6148(a) does not apply because her fee arrangement with the Forsters was governed by section 6148(d)(2). Under this theory, after the death of Robert James, appellant's fee arrangement with the Forsters did not need to be set forth in a signed writing because it was "implied by the fact" that her services were "of the same general kind as previously rendered to and paid for by the client."  (§ 6148(d)(2).)

Before James passed away, appellant's work on the Forster cases was governed by the 2002 Letter Agreement.  During that period, any work appellant did on the Forster cases was performed as James's contract attorney and subject to his supervision.  The 2002 Letter Agreement was drafted by appellant and signed by appellant and James, and there is no dispute regarding its validity.  Under its express terms, appellant's services were limited to performing legal research and writing assignments for James.  Appellant did not have any direct contact with James's clients, her contract work was expressly limited to assignments given to her by James, and James himself agreed to pay appellant for her work on the Forsters' case.

As a matter of law, the services that appellant allegedly provided pursuant to the May 2007 Engagement Letter were materially different than the services she performed as James's contract attorney.  During the period appellant was employed by James, the Forsters were James' clients.  In her May 2007 Engagement Letter, appellant proposed that the Forsters become her clients.  She offered to serve as their direct legal advisor, i.e., to take over the role that James had previously filled.  She also offered to assume sole responsibility for the preparation, filing and service of documents, as well as planning and executing strategies in the two pending cases.  Despite her admitted lack of pertinent experience, appellant also claimed authority to "work the number of hours that may be necessary, in my professional judgment, to plan effective strategy and to produce

23

work that is reasonably calculated to accomplish your overall goals in the litigation." Furthermore, unlike James who did not charge the Forsters for his services, appellant made it clear that she would charge a significant hourly rate for her services regardless of the outcome of her efforts.

Appellant contends she produced three types of evidence which could convince a reasonable jury that she rendered the "same general kind" of services on the Forster cases before and after James passed away. First, appellant posits that her time records from 2004 through 2008 show that before and after James died, appellant performed legal research, drafted pleadings and documents, and helped develop legal strategies. Even if this claim is accurate, this general type of legal work does not raise a triable issue of material fact with respect to the substantive distinctions between appellant's discrete assignment contract work for James, and her later offer to use her sole discretion to perform whatever services for the Forsters that she deemed appropriate.

Second, appellant characterizes her email correspondence with Bob during March and April 2007 as evidence of their mutual intent that appellant's future work would be a "continuation of the services" she provided before James died. Regardless of Bob's intent, the May 2007 Engagement Letter proposed a fundamentally new legal relationship between appellant and Bob, and it purported to authorize appellant to render materially different services than she was authorized to perform under the terms of her 2002 Letter Agreement with James.

Finally, appellant contends that evidence Rochelle paid appellant's fees before and after James died could support a finding that appellant performed the same kind of services throughout her involvement in the matters. Acknowledging that Rochelle did not directly pay any of appellant's invoices before Robert James died, appellant nevertheless contends that a reasonable jury could find that the invoices appellant submitted to James were "paid for by Rochelle" because Bob used community property to pay them. We need not address this strained argument because evidence that Bob paid the invoices appellant submitted to James does not diminish in any way the undisputed

24

evidence establishing that appellant did not perform the same "kind" of work after James died.

### B. Absent a Written Agreement, Rochelle is Not Liable to Appellant

#### *1. A Quantum Meruit Claim Is Barred by the Statute of Limitations*

As noted, when an agreement is voided under section 6148(c) "the attorney shall, upon the agreement being voided, be entitled to collect a reasonable fee." This provision of section 6148 codifies the general rule that when legal services have been provided without a valid written fee agreement, the attorney may recover the reasonable value of the services she performed in the action pursuant to a common count for quantum meruit. (See *Huskinson*, *supra*, 32 Cal.4th 453; *Flannery v. Prentice* (2001) 26 Cal.4th 572, 588-589; *Iverson*, *supra*, 76 Cal.App.4th at p. 996; *Swanson v. Moore* (*In re Moore*) (2012 E.D. Cal.) 2012 Bankr. Lexis 6132.) As our Supreme Court explained in *Huskinson, supra*, 32 Cal.4th at pages 460-461, by including subdivision (c) in section 6148, and a comparable provision in section 6147, the Legislature made a "policy determination that, even if a particular fee or compensation agreement is not in writing or signed by the client, a law firm laboring under such an agreement nonetheless deserves reasonable compensation for its services."

The two-year statute of limitations in Code of Civil Procedure section 339 governs claims for quantum meruit. (*Iverson*, *supra*, 76 Cal.App.4th at p. 996; Code Civ. Proc., § 339.) Where the claim of quantum meruit is based upon services performed under a contract that was void or voidable, the limitations period commences to run on either the date the last payment was made toward the attorney fees, or the last date that the attorney performed services in the case. (*Iverson*, at p. 996.)

In the present case, appellant filed her complaint against Rochelle in June 2012, three years 10 months after she formally terminated her limited scope representation of the Forsters. By that time, a cause of action to recover the reasonable value of appellant's services from Rochelle pursuant to a common count for quantum meruit or by virtue of any other obligation not founded in a writing was barred by the two-year statute of limitations governing such claims. (*Iverson*, *supra*, 76 Cal.App.4th at p. 996; Code Civ.

Proc., § 339.)  Thus, the absence of a written fee agreement conclusively establishes that Rochelle is entitled to summary judgment.

### 2. *Appellant's Account Stated Claim Fails as a Matter of Law*

Appellant attempts to salvage her claim against Rochelle by arguing that there are triable issues of material fact with respect to her cause of action for an account stated, even if the May 2007 Engagement Letter was not an enforceable attorney fee contract.

"An account stated is an agreement, based on prior transactions between the parties, that the items of an account are true and that the balance struck is due and owing. [Citation.]  To be an account stated, 'it must appear that at the time of the statement an indebtedness from one party to the other existed, that a balance was then struck and agreed to be the correct sum owing from the debtor to the creditor, and that the debtor expressly or impliedly promised to pay to the creditor the amount thus determined to be owing.'  [Citation.]" (*Maggio, Inc. v. Neal* (1987) 196 Cal.App.3d 745, 752.)

"The essential elements of an account stated are: (1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due.  [Citations.]" (*Zinn v. Fred R. Bright Co*. (1969) 271 Cal.App.2d 597, 600.)

Appellant contends that a jury could reasonably find that Rochelle consented to pay the July 2008 Invoice based on evidence that after Rochelle received that invoice she nevertheless (1) filed an objection to appellant's request to withdraw her limited scope representation; and (2) sent appellant a July 16 email in which she "promis[ed]" to pay appellant, and continued to request appellant's services.

First, appellant filed her application to withdraw her limited scope representation in June 2008, before she sent Rochelle the July 2008 Invoice.  The application was not based on an alleged failure to pay attorney fees and did not make any reference to a fee agreement.  By the same token, Rochelle's objection to appellant's application had nothing to do with attorney fees.  Evidence that Rochelle wanted appellant to represent

26

her is not evidence that Rochelle agreed to pay appellant $114,865.50 for services that were allegedly rendered to and not already paid for by Bob.

Second, Rochelle's July 16, 2008 email stated, in full: "Dear Sheryl, [¶] I have filed papers opposing your request to be released as my counsel at this time. [¶] Obviously, I am not in a position to represent myself. [¶] I am prepared to pay you to meet the upcoming deadlines, especially the July 24, provided I understand and approve what it is I am paying for. [¶] I need more information about the case in order to know what to pursue. [¶] We need to talk. Please call me. [¶] I will send you money as soon as I know what you are prepared to do. [¶] I will be in North Carolina for a service for Bob. I'll be back on Tuesday. [¶] Sincerely, [¶] Shelly Forster"

Appellant's characterization of this email as evidence that Rochelle consented to pay the July 2008 Invoice for $114,865.50 is plainly wrong. Rochelle unequivocally stated that she would pay appellant for future services to meet upcoming deadlines *if* she understood and approved what she was paying for. Thus, contrary to appellant's assertion, this email is further proof that Rochelle implicitly voided the May 2007 Engagement Letter and did not consent to pay the July 2008 Invoice.

Appellant argues that consent to pay her July 2008 Invoice can be inferred from the fact that Rochelle never advised appellant at any time that she did not intend to pay the July 2008 Invoice. According to appellant, Rochelle had an affirmative duty to review the July 2008 Invoice and promptly notify appellant of any objections she had to it, and her failure to do so is evidence that she assented to the underlying debt. As support for this theory, appellant cites *California B. G. Assn.v. Williams* (1927) 82 Cal.App. 434, 443 (*Williams*).

*Williams*, *supra*, 82 Cal.App.434, was an action by a farmers' cooperative association against one of its member growers to recover an excess advance paid to the defendant pursuant to a "bean crop contract." (*Id*. at pp. 435-436.) The amount of the advance was alleged in the complaint and admitted in the defendant's answer. (*Id*. at p. 437.) The association further alleged that this payment far exceeded the amount due to defendant for the quantity of beans he ultimately delivered to the association. The

27

calculation of the amount that defendant allegedly owed to the association was set forth in a statement of account that was in the defendant's possession for over two years, and there was no evidence defendant objected to it or questioned its accuracy. (*Id*. at pp. 438-439.) On these facts, the *Williams* court found that a trial court erroneously excluded evidence of the association's written statement of the defendant's account. In reaching this conclusion, the appellate court affirmed the rule that "parties seeking to prove an account stated must first show a pre-existing indebtedness between the parties," but it went on to find that both parties in that case had pleaded facts which established the "fact" of the underlying loan. (*Id*. at p. 441.) Thus, the association's statement of the defendant's account became an account stated when defendant assented to it by failing to object to it within a reasonable time. (*Id*. at pp. 442-443.)

*Williams* does not assist appellant here because there was no dispute in *Williams* that the plaintiff had loaned money to the defendant pursuant to a written contract. (*Williams*, *supra*, 82 Cal.App. at p. 441.) Thus, the rule applied in *Williams* was that a debtor has a duty to object to an accounting of his or her acknowledged debt within a reasonable time. (*Id*. at pp. 442-443.) But in this case, appellant failed to produce evidence of an enforceable contract entitling her to recover her legal fees from Rochelle, i.e., that Rochelle was her debtor. Appellant cannot avoid this failure of proof by shifting the burden to Rochelle to affirmatively dispute the accuracy of the July 2008 Invoice. Indeed, under these circumstances, Rochelle's failure to pay appellant's $114,000 bill was further notice to appellant that Rochelle did not agree that she incurred such a debt.

Even if appellant could produce evidence that Rochelle consented to pay the July 2008 Invoice, we would conclude that summary judgment was properly granted. Appellant contends that her account stated claim is governed by Code of Civil Procedure section 337, subdivision 2(2), which provides that a four-year limitations period applies to an "action to recover . . . upon an account stated based upon an account in writing, but the acknowledgement of the account stated need not be in writing." However, the absence of a written attorney fee agreement precludes appellant from proving there was an account stated that was "based upon an account in writing," as required for this four-

28

year limitations period to apply. Without a written agreement, the only way appellant can satisfy the first element of an account stated claim is to establish that Rochelle was indebted to her by virtue of an oral promise or implied agreement. As noted, however, any claim for indebtedness not founded upon a writing is barred by the two-year statute of limitations.

Citing *Richey v. Pedersen* (1950) 100 Cal.App.2d 512, 519-520 (*Richey*), appellant contends that an attorney can state a claim for a written account stated based solely on a written bill for her services. In *Richey*, an attorney sued his former client for the value of his attorney services and a declaration of his right to an interest in the client's real property. After a court trial, the court found that (1) there was no express agreement requiring the defendant to pay attorney fees or transfer any property interest to the plaintiff; (2) the plaintiff was entitled to the reasonable value of his services; and (3) the defendant had already paid the plaintiff the reasonable value of his services. On appeal, the attorney argued that an account had not been stated and satisfied prior to the filing of his lawsuit. Rejecting this argument, the *Richey* court found that (1) the defendant's employment of the attorney (which was undisputed) gave rise to an implied agreement that he would pay the reasonable value of the plaintiff's legal services; (2) an account was stated when the plaintiff rendered a statement setting forth what he believed to be the reasonable value of his services and the defendant made a partial payment and requested additional time to pay the balance; and (3) when defendant subsequently tendered a check for the balance due which the plaintiff accepted, "the account was then completely stated, if for any reason it was not stated before." (*Id*. at p. 520.)

Appellant's reliance on *Richey* is inapposite and unavailing. In that case, an antecedent agreement to pay the plaintiff's fees (i.e. the underlying indebtedness) was implied from the undisputed fact that the defendant had employed the plaintiff as his attorney. But in this case, the complaint allegations that a creditor-debtor relationship was created by a written contract cannot be proven for reasons we have already explained. Furthermore, to the extent appellant would now seek to prove an account

29

stated that is not based on a writing but rather on an implied agreement or equitable obligation, her claim is barred by the two-year statute of limitations.

At times it appears that appellant is arguing that the July 2008 Invoice is a stand-alone attorney fee agreement as well as a statement of her account. Clearly though, appellant's bill does not comply with the requirements of section 6148. Furthermore, in her brief to this court, appellant states that the July 2008 Invoice is not a contract for services, but rather "a regular monthly billing for services already rendered, which [appellant] issued pursuant to the May 2, 2007 written agreement." This concession is fatal to appellant's effort to characterize the second cause of action as a separate independent claim against Rochelle. The incidental keeping of accounts pursuant to an antecedent contract cannot be used to "extend the statute of limitations beyond the time it would [otherwise] run on the contractual obligation. [Citation.]" (*Warda v. Schmidt* (1956) 146 Cal.App.2d 234, 237.)

Indeed, courts uniformly hold that a plaintiff cannot use the device of pleading a common count, such as an open book account or account stated, in order to extend the statute of limitations period when the basis of the common count claim is factually identical to the barred contract claim. (See, e.g., *Filmservice Laboratories, Inc. v. Harvey Bernhard Enterprises, Inc*. (1989) 208 Cal.App.3d 1297, 1308 [claim for breach of an oral contract that was barred by two-year statute of limitations could not be "resurrected by the device of pleading" an account stated which was based on the same oral contract]; *Tillson v. Peters* (1940) 41 Cal.App.2d 671, 676 [two-year statute of limitations for action upon an oral contract could not be extended to four years "by the mere device of attempting to convert the cause into a suit based on an open book account"].)

Appellant's common count theory is based on the identical evidence appellant uses to support her first cause of action for breach of a written attorney fee agreement. However, there is insufficient evidence in this record to create a triable issue of fact with respect to the existence of a written attorney fee agreement between appellant and Rochelle. This deficiency establishes that any claim appellant has against Rochelle for

her unpaid fees could only arise from an obligation that it not based on a writing.  The statute of limitations for such a claim is two years.  Because appellant filed her complaint more than two years after the accrual of her claims against Rochelle, summary judgment was properly granted.

## V.

## DISPOSITION

The judgment is affirmed.  Rochelle is awarded costs on appeal.

_____
RUVOLO, P. J.

We concur:

_____
REARDON, J.

_____
STREETER, J.

Trial Court:                                    Alameda County Superior Court

Trial Judge:                                  Hon. Gail Brewster Bereola

Counsel for Appellant:                  Sheryl Kathryn Leighton, in Propria Persona

Counsel for Respondent:                Jeff Pollack