Filed 5/20/25  Innerspin Marketing v. Consequent Capital Management CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| INNERSPIN MARKETING, LLC, | B336816 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 21SMCV01850) |
| v. | |
| CONSEQUENT CAPITAL MANAGEMENT, LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael E. Whitaker, Judge.  Affirmed.

Ken Simon Law and Kenneth O. Simon; Troygould, Christopher A. Lilly and Chinelo N. Ikem for Defendant and Appellant.

Law Offices of Thomas Carter and Thomas P. Carter for Plaintiff and Respondent.

Defendant and appellant Consequent Capital Management, LLC (Consequent) appeals from a judgment entered after a jury verdict in favor of plaintiff and respondent Innerspin Marketing, LLC for $448,000 on its claims for account stated and open book account. Consequent contends instructional error requires the jury's verdict to be reversed on appeal. Consequent argues that although an instruction on adoptive admissions was legally correct, it was not warranted based on the facts of the case and it misled the jury into finding that Consequent's silence in response to Innerspin's invoices amounted to a promise to pay the invoiced amounts. Based on our review of the briefs and the record, Consequent has not established that any instructional error was prejudicial. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Overview

Consequent is a fund management group that works with entities such as pension or retirement funds to manage the funds' investments. Innerspin is a marketing agency that assists clients such as Consequent with marketing and other services, including assistance with preparing requests for proposal (RFP) responses.

Consequent started working with Innerspin in 2017, and continued through March 2021. Over the course of the working relationship between the two companies, Consequent fully paid some of Innerspin's invoices, partially paid others, and did not make any payment on others. In late March 2021, Innerspin demanded payment of outstanding invoices and stopped doing work for Consequent.

## B.    Parties' Course of Conduct

Although not all the invoices appear in the appellate record, neither party disputes that Innerspin sent Consequent monthly invoices, or that the monthly invoiced amounts were $15,000 in 2017, $20,000 from August 2018 through December 2020, and $10,000 from January through March 2021.

The appellate record does not provide much detail about how the nature of Innerspin's work for Consequent varied from one month to the next.  An August 2018 written contract, discussed in more detail below, identified Innerspin's scope of work to include branding, marketing, website maintenance, RFP support, bookkeeping support, and information technology (IT) support services.  During trial, Consequent presented evidence that it engaged separate vendors to work on its website, and to provide bookkeeping and IT support services.  While there was conflicting evidence over the extent and nature of the RFP support services Innerspin provided to Consequent, it was undisputed that those RFP services were provided over the course of the parties' relationship.

## C.    Written Contract

In August 2018, the two companies signed a proposal by Innerspin, identifying Consequent as the client, and describing its objective as:  "Provide 1-month of support for Consequent Capital Management from August 1, 2018-September 1, 2018."  The description of the scope of work included branding,

marketing, website maintenance, RFP support, bookkeeping support, and IT support.

Although Consequent asked for the contract to be for one month only, there is no evidence the parties expressly discussed the terms and conditions of any arrangement after the initial month, and the agreement itself contains potentially conflicting language.  Under a section entitled "Monthly Fees," the written contract states "Month fee:  $20,000 for August 1, 2018-September 1, 2018."  Immediately following is a section entitled "Fee and Terms," which states "Monthly fee is based on a flat fee of $20,000 per month.  This proposal and 'Agreement' shall not renew unless . . . agreed upon by both parties in writing."  On the same page, under the heading "Additional Information," the proposal states "Monthly fee will be billed at the beginning of each month.  Any significant hours used beyond the Scope of Work will be billed at the end of each month."  In the "Standard Terms and Conditions" section, the proposal provides that "The term of this agreement shall continue until terminated upon thirty (30) days prior written notice by either party . . . ."

## D.    Innerspin's Invoicing and Collection Efforts

In July 2020, Innerspin employee Alyna Choi (Alyna)[1] sent an email to Scott Cha-Choe, Consequent's Chief Financial Officer (CFO), attaching a statement of accounting of Consequent's past

---

[1] During the relevant time frame, Elcid Choi was an owner and president of Innerspin as well as a board member on Consequent's Board of Directors.  Alyna Choi and Elcid Choi are unrelated, and we refer to them by first name to avoid confusion.

due invoices, together with copies of the unpaid invoices. The accounting showed a $285,000 balance due for unpaid invoices spanning the time period from July 2017 through July 2020. The email text stated: "Please find a summary of open invoices attached. [¶] Can you kindly confirm payment status on invoices or plans for next payment." Alyna sent similar statements of accounting, listing individual unpaid invoices and providing a total amount outstanding, to Consequent in October 2020, December 2020, and January, February, and March 2021. Each email indicated the attachments included the most recent invoice and a statement of open invoices and asked when Innerspin could expect payment.

A later accounting showed that starting in August 2018, Consequent paid $20,000 to Innerspin for nine separate months: August, September, October and November of 2018, January, June, August, September and December of 2019. Consequent paid Innerspin $15,000 in December of 2018, and it made no payments for the months of February through May, July, and October 2019, and January through September 2020. From October 2020 through January 2021, Consequent paid varying amounts, either $3500 or $5000. Innerspin began invoicing Consequent for $10,000 monthly starting in January 2021, and Consequent paid the full $10,000 in February 2021.

On March 10, 2021, Alyna sent an email to Consequent CFO Scott Cha-Choe and CEO John Robinson, attaching the March 2021 invoice of $10,000 and a statement of account showing an outstanding balance of $448,000. After Alyna answered some clarification questions, Robinson responded, "Based upon the reconciliation of invoices and payments, I reviewed and the amount owed to Innerspin Marketing is correct.

I will forward the information to our accounting firm to adjust Quickbooks."

## E.    The Instant Action

In November 2021, Innerspin sued Consequent to recover the outstanding $448,000.  Innerspin's complaint alleged claims for breach of written contract, indebtedness, account stated, open book account, and goods/services sold and delivered.  Consequent filed a cross-complaint for declaratory relief against Innerspin, seeking a declaration that the agreement between Innerspin and Consequent was rescinded, or alternatively that the only amount owing under that agreement was $20,000.  The cross-complaint also included a cause of action for fraud in the inducement against Innerspin and Elcid Choi (Elcid), seeking compensatory damages, repayment of all monthly fees, and punitive damages.  Elcid and Innerspin filed a sur-cross-complaint for fraud in the inducement, negligent and intentional interference with prospective economic advantage, intentional interference with contractual relationship, and unjust enrichment and restitution.

Ultimately, except for Innerspin's claims for account stated and open book account, all other claims and cross claims were dismissed with prejudice.  The case proceeded to jury trial on the two common counts in December 2023.

At trial, Innerspin requested that the jury instructions include CACI No. 213 regarding adoptive admissions.  Innerspin argued that Consequent's silence and failure to object to the invoices amounted to an admission that Consequent owed and was promising to pay the amounts invoiced.  Consequent objected to the instruction, arguing that the adoptive admissions

6

instruction erroneously would lead the jury to conclude Consequent's silence automatically equaled a promise to pay Innerspin the $448,000. The trial court overruled Consequent's objection and elected to give the instruction.

The jury was presented with a special verdict form agreed to by the parties. The form tracked the elements of the CACI instructions on account stated and open book account, requiring a jury finding on each element to hold Consequent responsible for payment to Innerspin. After deliberations, the jury returned a verdict in favor of Innerspin on both common counts, finding Consequent owed Innerspin $448,000.

Consequent timely appealed from the judgment entered against it.

## DISCUSSION

On appeal, Consequent contends that the court erred in giving CACI No. 213, and it seeks to reverse the judgment with directions to the court to conduct a new trial. Consequent specifically contends that CACI No. 213 is an instruction that is intended to be given in the context of an evidentiary dispute over hearsay statements, an issue that was not presented here.[2] Instead, Consequent argues that Innerspin sought and used

---

[2] An accusation of wrongdoing that should, but does not, provoke a denial is admissible evidence under the adoptive admission exception to the hearsay rule. (See CACI No. 213; *Bowles v. State Bar* (1989) 48 Cal.3d 100, 108 [attorney misconduct finding based on an adoptive admission was valid, where client's mother testified about her letter accusing attorney of failing to provide legal services and demanding a reply].)

CACI No. 213 to alter the requirement that Innerspin prove that Consequent *promised to pay* the claimed amount due. According to Consequent, the disputed jury instruction on adoptive admissions effectively substituted Consequent's silence after receiving invoices for the required proof of a promise to pay, thereby improperly altering the elements of the common counts.

We need not examine whether the trial court erred in giving CACI No. 213 on adoptive admissions.[3] Even if we assume instructional error, our examination of the record leads us to conclude that any such error was not prejudicial, because Consequent has not demonstrated that absent the purportedly erroneous instruction, it was reasonably probable that the jury would have reached a more favorable verdict.

---

[3] " 'The propriety of jury instructions is a question of law that we review de novo. [Citation.]' [Citation.]" (*Jackson v. AEG Live, LLC* (2015) 233 Cal.App.4th 1156, 1187; accord, *Martinez v. Rite Aid Corp.* (2021) 63 Cal.App.5th 958, 969.) In general, " '[a] party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence.' " (*Evans v. Hood Corp.* (2016) 5 Cal.App.5th 1022, 1045.) " '[A]n instruction correct in the abstract, may not be given where it is not supported by the evidence or is likely to mislead the jury. [Citation.]' [Citation.]" (*Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606, 619.) Innerspin does not attempt to argue that the adoptive admission instruction was warranted based on the facts of the case, instead arguing that Consequent either waived or forfeited its right to complain about the instruction. For the sake of judicial efficiency, we assume instructional error and focus instead on whether Consequent has met its burden to show prejudice.

## A.     Standard of Review

Even where there is instructional error, reversal is not warranted unless it is reasonably probable that the jury may have based its verdict on the erroneous instruction.  (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.)  "When deciding whether an instructional error was prejudicial, 'we must examine the evidence, the arguments, and other factors to determine whether it is *reasonably probable* that instructions allowing application of an erroneous theory *actually* misled the jury.'  [Citation.]  A 'reasonable probability' in this context 'does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*'"  (*Kinsman*, *supra*, at p. 682.)

"A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.'  (Cal. Const., art. VI, § 13.)"  (*Soule*, *supra*, 8 Cal.4th at p. 574.)  Reviewing courts generally find prejudice "only ' "[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction . . . ." ' [Citation.]"  (*Ibid*.)  "Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.'  [Citations.] . . . [T]hat determination depends heavily on the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury."  (*Soule*, at p. 580.)

Regardless of whether the instructional error was one of commission or omission, in assessing actual prejudice, a

reviewing court must review the individual trial record, including "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule, supra,* 8 Cal.4th at pp. 580–581, fn. omitted.)

## B.    Law on Common Counts

" 'A common count is not a specific cause of action . . . ; rather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness . . . .' " (*Professional Collection Consultants v. Lujan* (2018) 23 Cal.App.5th 685, 690 (*Lujan*).)  Open book account and account stated are two common counts.

### 1. *Account Stated*

"An account stated is an agreement, based on prior transactions between the parties, that the items of an account are true and that the balance struck is due and owing." (*Maggio, Inc. v. Neal* (1987) 196 Cal.App.3d 745, 752 (*Maggio*); accord *Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 968 (*Lauron*).)  The elements that comprise an account stated are:  "(1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due." (*Zinn v. Fred R. Bright Co.* (1969) 271 Cal.App.2d 597, 600 (*Zinn*); *Maggio*, at

10

pp. 752–753; see also California Civil Jury Instructions (CACI) No. 373.)

An account stated may arise in a variety of commercial situations, from open book accounts to acknowledgment of debt consisting of a single item. "The key element in every context is agreement on the final balance due." (*Maggio, supra*, 196 Cal.App.3d at p. 753.) "The agreement of the parties necessary to establish an account stated need not be express and frequently is implied from the circumstances. In the usual situation, it comes about by the creditor rendering a statement of the account to the debtor. If the debtor fails to object to the statement within a reasonable time, the law implies his agreement that the account is correct as rendered." (*Zinn, supra*, 271 Cal.App.2d at p. 600; see also *Lauron, supra*, 8 Cal.App.5th at p. 968 [the debtor's assent may be implied from his conduct].)

2. *Open Book Account*

"A *book account* is a detailed statement of debit/credit transactions kept by a creditor in the regular course of business, and in a reasonably permanent manner. [Citation.] In one sense, an *open-book account* is an account with one or more items unsettled. However, even if an account is technically settled, the parties may still have an open-book account, if they anticipate possible future transactions between them." (*Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 579, fn. 5.)

"A book account may furnish the basis for an action on a common count ' ". . . when it contains a statement of the debits and credits of the transactions involved completely enough to supply evidence from which it can be reasonably determined

11

what amount is due to the claimant." ' [Citation.] A book account is described as 'open' when the debtor has made some payment on the account, leaving a balance due." (*Interstate Group Administrators, Inc. v. Cravens, Dargan & Co.* (1985) 174 Cal.App.3d 700, 708; see also *Lujan, supra*, 23 Cal.App.5th at pp. 690–691.)

The elements of an open book account cause of action are: the existence of a financial relationship between the parties; that the creditor, in the regular course of business, kept an account of the debits and credits involved in the transactions; that the debtor owes money on the account; and evidence showing the amount owed. (See CACI No. 372; *Interstate Group, supra*, 174 Cal.App.3d at p. 708.)

## C.    Consequent Has Not Shown Prejudice Stemming from Instructional Error

Assuming without deciding that the jury should not have received the CACI No. 213 instruction on adoptive admissions, Consequent has not shown a reasonable probability that the jury would have reached a different verdict if the erroneous instruction had not been given. Consequent cannot show prejudicial error because the common counts of account stated and open book account permit a jury finding of an implied agreement to pay the invoiced amounts based on the parties' conduct, and there was ample evidence of such an agreement here.

The main thrust of Consequent's argument is that the instruction on adoptive admissions allowed Innerspin to bypass the requirement to show a promise by the debtor to pay the

12

amounts identified in the account stated or open book account. Consequent contends that the adoptive admissions instruction misled the jury into believing that Consequent's silence, i.e., the absence of any response to Innerspin's invoices, constituted not just an admission that Consequent owed the identified sums to Innerspin, but also a promise to pay.

Under *Soule*, we are tasked with reviewing the entire trial record in assessing prejudice, including other instructions, counsel's arguments, and the evidence presented. (See *Soule*, at pp. 580–581.) Although Innerspin's counsel requested the CACI No. 213 instruction, and called the jury's attention to that instruction several times during closing argument, because the law on common counts permitted the jury to consider the parties' conduct, and there was ample evidence to support the jury's determination that Innerspin had satisfied the elements for an account stated and open book account, Consequent's argument that the jury was misled by the adoptive admissions instruction is nothing more than an abstract possibility, insufficient to show prejudice. (*Kinsman*, *supra*, 37 Cal.4th at p. 682.)

Most importantly, without an adoptive admissions instruction, a promise to pay may still be implied by the parties' conduct, including Consequent's choice to continue working with Innerspin without objection, while it continued to receive services and monthly invoices from Innerspin. Consequent argues that under *Leighton v. Forster* (2017) 8 Cal.App.5th 467, 491, there was no evidence to support a finding that it had promised to pay the full $448,000 as an account stated. *Leighton* involved an attorney's suit to recover fees from a client, and the court reasoned that the language of the client's response did not constitute an agreement to pay the entire outstanding fee

13

amount.  (*Ibid*.)  However, other cases make it clear that the promise to pay can be inferred from the parties' course of conduct.  (See, e.g., *Maggio, supra*, 196 Cal.App.3d at pp. 752–753 [debtor may expressly or impliedly promise to pay the amount determined to be owing]; *Zinn, supra*, 271 Cal.App.2d at p. 600 [a debtor's failure to object to a statement of account "within a reasonable time . . . implies his agreement that the account is correct as rendered"].)

Consequent argues that the $282,000 it had already paid to Innerspin was the extent of its obligation.  Consequent did present some evidence about the *value* of the services provided by Innerspin, but it does not dispute that the two companies had an ongoing business relationship from 2017 through March 2021.  It also did not offer any evidence at trial that it did not receive Innerspin's monthly invoices.  Innerspin emphasizes on appeal that there was no evidence that Consequent disputed any of Innerspin's invoices or statements of account.

Against this backdrop, Consequent argues that CACI No. 213[4] improperly permitted the jury to construe its silence as

---

[4] CACI No. 213 – Adoptive Admissions read:

"You have heard evidence that representatives of Innerspin Marketing, LLC made statements via emails to Consequent Capital Management, LLC representatives Scott Cha-Choe and John Robinson about the amount that Consequent Capital Management, LLC owed to Innerspin Marketing.  You may consider those statements as evidence against Consequent Capital Management only if you find that all of the following conditions are true: "1.  The statements were made to representatives of Consequent Capital Management;

14

an implicit promise to pay the invoiced amounts.  However, the jury was also given CACI No. 372 and 373, the instructions for account stated and open book account.[5]  The jury instructions for

"2.     The representatives of Consequent Capital Management received and understood the statements;

"3.     The representatives of Consequent Capital Management would, under all the circumstances, naturally have denied the statement if they thought the statements were not true; AND

"4.     The representatives of Consequent Capital Management could have denied the statements but did not.

"If you decide that any of these conditions are not true, you must not consider for any purpose a statement made by an individual to be adopted by Consequent Capital Management, LLC."

[5] CACI No. 372 – Common Count:  Open Book Account read:

"A book account is a written record of the credits and debts between parties to a contract.  A book account is "open" if entries can be added to it from time to time.

"Innerspin Marketing, LLC claims that there was an open book account in which financial transactions between the parties were recorded and that Consequent Capital Management, LLC owes it money on the account.  To establish this claim, Innerspin Marketing, LLC must prove all of the following:

"1.     That Innerspin Marketing, LLC and Consequent Capital Management, LLC had financial transactions with each other;

"2.     That Innerspin Marketing, LLC in the regular course of business kept a written and/or an electronic account of the debits and credits involved in the transactions;

"3.     That Consequent Capital Management, LLC owes Innerspin Marketing, LLC money on the account; and

15

account stated in particular clarify that both the agreement on the amount and the promise to pay could be evidenced by words or by conduct, and that is consistent with the law governing a claim for account stated. To prove its claim for account stated, Innerspin had to prove, among other elements, that Innerspin

---

"4.    The amount of money that Consequent Capital Management, LLC owes Innerspin Marketing, LLC."

CACI No. 373 – Common Count: Account Stated read:

"An account stated is an agreement between the parties, based on prior transactions between them establishing a debtor-creditor relationship, that a particular amount is due and owing from the debtor to the creditor. The agreement may be oral, in writing, or implied from the parties' words and conduct.

"Innerspin Marketing, LLC claims that Consequent Capital Management, LLC owes it money on an account stated. To establish this claim, Innerspin Marketing, LLC must prove all of the following:

"1.    That Consequent Capital Management, LLC owed Innerspin Marketing, LLC money from previous financial transactions;

"2.    That Innerspin Marketing, LLC and Consequent Capital Management, LLC, by words or conduct, agreed that the amount that Innerspin Marketing, LLC claimed to be due from Consequent Capital Management, LLC was the correct amount owed;

"3.    That Consequent Capital Management, LLC, by words or conduct, promised to pay the stated amount to Innerspin Marketing, LLC;

"4.    That Consequent Capital Management, LLC has not paid Innerspin Marketing, LLC all of the amount owed under this account; and

"5.    The amount of money that Consequent Capital Management, LLC owes Innerspin Marketing, LLC."

16

and Consequent "*by words or conduct, agreed* that the amount that Innerspin . . . claimed to be due from Consequent . . . was the correct amount owed;" and that Consequent "*by words or conduct, promised to pay* the stated amount to Innerspin . . . ." (Italics added.)

Although Consequent acknowledges the possibility of an "implied agreement," its argument focuses on the absence of any evidence of an *express promise to pay* the invoiced amounts, and the concept that the adoptive admission instruction allowed Innerspin to bypass a key element of its common count claim: a promise to pay. For example, Consequent argues that "A review of the totality of the evidence adduced at trial will reflect that Consequent never promised to pay the $448,000 that Innerspin wanted above and beyond the $282,000 that Consequent paid to Innerspin." Consequent also argues that while the evidence supported a finding that it had assented to the accuracy of the amount identified in Innerspin's summary of invoices, there was no evidence that Consequent promised to pay that amount. Consequent relies solely on its position that because the written agreement was expressly limited to one month of services, it was under no obligation to object to later invoices to avoid an implicit obligation to pay the invoiced amounts.

During closing argument, Consequent compared its payment obligation to Innerspin to a "bar tab," in contrast to a monthly "gym membership," arguing that email exchanges about the August 2018 written contract established that Consequent made it clear that it wanted a bar tab, not a gym membership. Counsel for Consequent addressed the March 10, 2021 email which Consequent's president sent to Alyna at Innerspin, stating "Based upon the reconciliation of invoices and payments, I

17

reviewed and the amount owed to Innerspin marketing is correct", explaining that the email only confirmed that Alyna's math was correct, but did not amount to a promise to pay the outstanding amount. The attorney argued that Innerspin had not met the "promise to pay" element: "You send invoices and you send statements, that doesn't create a meeting of the minds. That doesn't create an agreement. It doesn't force somebody into a gym membership they didn't sign up for, and that they objected to repeatedly. There must be a promise to pay, and there was no promise to pay." Consequent makes similar arguments on appeal. This argument ignores the law providing that the agreement to pay need not be express, but can be implied from the parties' conduct.

Just as importantly, Consequent has not pointed us to any evidence in the record that would support its theory that after August 2018, the parties ongoing agreement fell under a bar tab, or à la carte, style of paying for services, as opposed to the monthly gym membership theory which was supported by Innerspin's monthly invoices. In fact, our independent review of the record revealed that the only evidence relating to a possible à la carte arrangement appears at the tail end of the parties' business relationship, in a March 23, 2021 email from Consequent's chief financial officer inquiring into Innerspin's "[à la] carte cost for RFP assistance. Please advise what overall work you provide for the $10,000/month invoice." The CFO's email was sent after a March 17, 2021 email in which Innerspin advised that "effective April 1, 2021, all work and services from Innerspin Marketing will be paused until we can get your account status up-to-date."

18

Other exchanges during trial underscore the futility of Consequent's efforts to show that the adoptive admissions instruction was prejudicial. First, during a discussion about jury instructions while the trial was underway, in the context of CACI No. 373 on account stated, Consequent's counsel agreed that a party's failure to object to an invoice could be construed as acceptance of the truth of that invoice, "a reasonable inference" that was "fair" and one that he would not object to. Second, the jury's special verdict form focused the jury's attention on the parties' words or conduct, rather than on the absence of any response to a specific invoice. Third, the jury here completed a special verdict form, and nine of the twelve jurors answered "yes" to the following question: "Do you find that Consequent Capital Management, LLC, by words or conduct, promised to pay the stated amount to Innerspin Marketing, LLC?" The focus on "words or conduct," and the absence of any reference to Consequent's silence, weighs heavily against Consequent's contention of prejudicial error.

Because the jury's verdict was well supported by the evidence presented at trial, and Consequent has not shown a reasonable probability that giving the adoptive admissions instruction misled the jury in a manner that led to a miscarriage of justice, we conclude that even if it was error to give that instruction, the error was harmless.

19

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to plaintiff and respondent Innerspin Marketing, LLC.

NOT TO BE PUBLISHED.

MOOR, J.

WE CONCUR:

HOFFSTADT, P. J.

KIM (D.), J.