Filed 6/1/26  Pech v. Morgan CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RICHARD PECH,<br><br>    Plaintiff, Cross-Defendant and Appellant,<br><br>    v.<br><br>THOMAS E. MORGAN III,<br><br>    Defendant, Cross-Complainant and Respondent. | B335584<br><br>Los Angeles County<br>Super. Ct. No.<br>18STCV04084 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge.  Affirmed.

Law Offices of Richard Pech and Richard Pech, in pro. per., for Plaintiff, Cross-Defendant and Appellant.

Joshua R. Furman Law Corp. and Joshua R. Furman for Defendant, Cross-Complainant and Respondent.

————————————————

Plaintiff and cross-defendant Richard Pech appeals a judgment entered on the jury's verdict in favor of defendant and cross-complainant Thomas E. Morgan III on Morgan's claim for legal malpractice; and the trial court's order granting judgment notwithstanding the verdict (JNOV) on Pech's claim for an account stated. Pech principally contends the evidence compelled a finding in his favor on his affirmative defense to the legal malpractice claim; and the court misapplied the law governing account stated claims based on attorney fee billing statements in granting JNOV. The record does not support these or Pech's other claims of error. We affirm.

## BACKGROUND

### 1. *The Parties*

Plaintiff and cross-defendant Richard Pech is an attorney. Defendant and cross-complainant Thomas Morgan is the trustee of the Beverly C. Morgan Family Trust (the Trust) and a Trust beneficiary.[1] Morgan originally served as trustee from January 2014 until his court-ordered suspension in March 2017. In June 2019, the court reinstated Morgan as trustee.

### 2. *Pech's Complaint*

In November 2018, Pech sued Morgan for unpaid legal fees, asserting claims for breach of contract, account stated, and quantum meruit. The operative pleading alleges Pech has represented Morgan and "dozens of his related entities" in "numerous legal matters" for nearly twenty years, mostly in connection with mobile home parks that Morgan either owned or managed for business entities owned by the Trust.

---

[1] Beverly Morgan is Thomas Morgan's late mother.

After Beverly Morgan's death in January 2014, Morgan allegedly began consulting Pech about potential disputes involving the Trust.  Under an informal agreement based on their years-long personal and professional relationship, Pech monitored Trust developments, particularly those related to anticipated litigation by Morgan's sister, Nancy Shurtleff. In May 2014, Shurtleff filed a petition challenging the Trust, alleging Morgan had exerted undue influence over their late mother.

In June 2014, Pech and Morgan entered into a retainer agreement, which Morgan executed in his capacity as trustee. The same month, Pech filed a petition for interpretation of the Trust in the Orange County Superior Court (the Trust Litigation).

From November 2014 to January 2017, Pech represented Morgan in the Trust Litigation, including in connection with Shurtleff's petitions to remove or suspend Morgan as trustee. Pech sent Morgan periodic billing statements during this time, listing balances totaling several hundred thousand dollars in fees.  Each page of each statement included the notation, "**PLEASE EMAIL/FAX US IF YOU DISPUTE ANY AMOUNT ON THIS BILL.**"  The complaint alleges "Morgan never questioned, disputed, or objected to the services or costs in any of the statements" and he paid the full balance of each statement in his capacity as trustee.

In January 2017, the probate court denied Shurtleff's motion to suspend Morgan as trustee.  However, the court observed that Morgan appeared to have used Trust assets to pay for expenses incurred in his personal capacity, including to defend against Shurtleff's claim of undue influence and

3

other claims challenging testamentary gifts made to Morgan as a Trust beneficiary. Accordingly, the probate court ordered Morgan to file an accounting of Trust assets that he may have used to finance his personal defense.

In March 2017, the probate court suspended Morgan as trustee and appointed Bruce and Lee Ann Hitchman (the Hitchmans) as interim trustees.[2] On April 7, 2017, Pech emailed Morgan, stating, "Now that [the probate court] has appointed interim trustees, paying my statements from January 1, 2017 through your reappointment as trustee is your personal responsibility." (Bold and underlining omitted.) Based on these "changed circumstances," the complaint alleges "Pech and Morgan agreed to update the Trust Litigation Retainer to reflect Pech's representation of Morgan in his individual capacity" and "Morgan orally agreed that he would be personally liable under the Trust Litigation Retainer for payment of the fees and costs for the Trust Litigation until such time as he was reappointed as trustee." Consistent with this alleged novation, Pech continued to send Morgan billing statements, and Morgan paid Pech a total of $200,000 from his personal checking account in full and partial satisfaction of Pech's February, March, and April 2017 statements.[3]

---

[2] Pech's complaint does not allege or otherwise disclose why Morgan was suspended. As we will discuss, the evidence shows Pech prepared and filed an accounting that the probate court determined was "wholly inadequate," and Morgan was suspended for his failure to follow the court's order.

[3] Pech alleges the April 2017 statement for $194,608.72 was only partially paid, while Morgan paid in full the February and March statements totaling more than $187,000.

4

In June 2017, Morgan allegedly told Pech he wanted "a more 'friendly probate face' " to appear before the probate court, given the court's adverse orders and comments during recent hearings.  Later that month, Morgan associated attorney Justin Gold into the Trust Litigation.

Although Gold took on a more public-facing role, Pech continued working on the matter and generating substantial fees.  The complaint alleges Morgan "never questioned, disputed, or objected to the services or costs" reflected in Pech's billing statements, but Morgan did not pay any statements issued after April 2017.  Nevertheless, from June to December 2017, Pech and Morgan allegedly had a series of communications in which Morgan promised to pay Pech all amounts due and owing for Pech's work on the Trust Litigation.

In December 2017, Morgan substituted Pech out of the case, citing concerns that Pech's relationship with the probate court was " 'beyond repair.' "  Morgan nevertheless kept Pech on other matters and told Pech he was expected to continue assisting the "new Probate 'front' legal team."  On December 29, 2017, Morgan's new counsel, Scott Bertzyk, filed a substitution of attorney, formally ending Pech's representation.  Pech's final billing statement, dated May 31, 2018, reflected an unpaid balance of $580,186.40.

3.    *Morgan's Cross-Complaint*

In August 2019, Morgan filed a cross-complaint against Pech for legal malpractice and related claims.[4]  The operative

---

[4]    Morgan asserted his cross claims in both his individual and trustee capacities.  On Pech's demurrer, the trial court dismissed the trustee claims as untimely.  Only Morgan's individual claims remained when the case went to trial.

pleading alleges Pech undertook to represent Morgan in the Trust Litigation in both Morgan's individual and trustee capacities; however, Pech failed to advise Morgan that this concurrent representation presented a conflict of interest that necessitated certain protective measures under established probate law.  Pech allegedly breached the standard of care by, among other things, failing to obtain a conflict waiver; failing to maintain separate files or to prepare separate invoices for each representation; and failing to ensure Trust assets were not used to pay attorney fees generated to represent Morgan in his individual capacity.

The cross-complaint primarily focuses on Morgan's suspension and the consequences that followed.  According to the pleading, Shurtleff's petitions sought to remove Morgan as trustee and to reduce his inheritance by eliminating a valuable testamentary gift.  Although these petitions implicated different interests—challenging both Morgan's authority as trustee and his beneficial interest in certain Trust assets—Pech allegedly instructed Morgan to use Trust resources to pay all of Pech's fees, rather than counseling Morgan to use personal funds for his individual defense.[5]  When the probate court learned of the

---

[5]     The cross-complaint alleges this was plainly negligent advice under the established rules stated in *Whittlesey v. Aiello* (2002) 104 Cal.App.4th 1221, 1231 [when an attorney undertakes to represent the interests of certain beneficiaries over others, "counsel must seek compensation from the parties who stand to gain from the litigation, not the trust"] and *Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1134 ["If a predecessor trustee seeks legal advice in its personal capacity out of a genuine concern for possible future charges of breach of fiduciary duty, the predecessor may be able to avoid disclosing the advice to

6

arrangement, it ordered Morgan to file an accounting of all Trust assets spent on his personal defense.

Pech filed an accounting with a single sentence stating, "The amount of trust assets spent or incurred by, or allocated to, the Trust[ ] to defend Morgan in his personal capacity is $254,650.00." The accounting did not disclose the amount of Trust assets spent on behalf of Morgan in his trustee capacity, nor did it offer an explanation or justification for the expenditures of Trust resources for his personal defense. Instead, the accounting explained that, to arrive at the $254,650 figure, "the Law Offices of Richard Pech undertook the review and analysis of the attorney-client privileged communications and/or work product consisting of detailed statements of fees and costs sent to Morgan to inform him of the nature and amount of work occurring in connection with the active and ongoing legal matters in this case," which the accounting characterized as "information [that] lies in the heartland of the attorney-client privilege." The cross-complaint alleges Pech filed the accounting without giving Morgan "adequate time to review or understand the response," without advising Morgan "as to the import and standard for probate accountings," and without seeking Morgan's "input as to how to approach the accounting."

The probate court responded by suspending Morgan as trustee and directing the parties to meet and confer on the appointment of a private professional fiduciary to serve as interim trustee in his place. The court's order explained: "[T]he accounting that was filed is wholly inadequate and does

a successor trustee by hiring a separate lawyer and paying for the advice out of its personal funds."].

not conform, in any respect, to the accountings required by the Court.  The accounting is, in fact, so inadequate that its filing appears to be for the sole purpose of paying lip service to the Court's order."

Notwithstanding the probate court's order, Pech allegedly failed to meet and confer about an interim trustee, while advising Morgan "not [to] participate in the process at all, lest his participation be viewed as tacit acquiescence to the suspension order."  Pech's advice gave Morgan's litigation opponents the space to nominate their "hand-selected fiduciaries" —the Hitchmans—as interim trustees and, after the Hitchmans' appointment, to align themselves with the interim trustees to make "onerous demands" on Morgan.  This included a demand— based largely on the inadequate accounting—to turn over all of Pech's legal invoices.  Pech refused to produce the invoices and advised Morgan not to produce them either.  In the end, Morgan was forced to accede to the demand, after the probate court issued an order to show cause regarding contempt and an appellate court denied Pech's petition for a writ of mandate.

In June 2017, "recognizing that Pech had antagonized" the probate court, Morgan associated co-counsel into the Trust Litigation to help present his case in "a way better calibrated to success."  However, it soon became clear that having co-counsel "try to rei[n] in Pech was not enough," and, in December 2017, Morgan finally terminated Pech's representation and replaced him with a different law firm.  Over the next year and a half, Morgan's new counsel worked to correct the damage allegedly caused by Pech's "substandard representation," finally securing Morgan's reinstatement as trustee in June 2019.  During the period, Morgan incurred approximately $2 million in legal fees

8

to pay his new attorneys, which he claimed as damages for Pech's alleged malpractice.

**4.    *The Jury Trial***

Pech represented himself at trial and testified on his own behalf, largely corroborating the allegations of his operative pleading. He testified it had been his custom over nearly four decades of practice to send clients detailed billing statements; as of November 2017, Morgan had not said he would not pay Pech's bills; and, until April 2018, Morgan had never disputed or questioned Pech's billing statements. Pech testified his unpaid fees totaled over $580,000 and, based on his review of over 3,000 pages of billing statements, this was also the reasonable value of the services he rendered to Morgan in the Trust Litigation.

As for his alleged negligence and Morgan's claimed damages, Pech admitted his invoices did not differentiate between work performed for Morgan in his trustee versus individual capacity and Pech never advised Morgan not to use Trust assets for his personal defense. While he did not respond to proposals from Shurtleff's counsel regarding potential professional fiduciaries to serve as interim trustee, Pech testified he had no reason to believe the Hitchmans would engage in intentional misconduct that amounted to "pillaging" and "looting the Trust."

Morgan likewise testified on his own behalf and generally corroborated the allegations in his cross-complaint. He testified Pech never advised him of the risks of using Trust funds to pay Pech's fees and it was only after retaining new counsel that he learned of the protective measures he should have taken to maintain separation between his trustee duties and beneficiary interests. Nevertheless, Morgan admitted he did not dispute

9

Pech's bills until April 2018—nearly a year after hiring his first new attorney—but he claimed he remained silent only because he trusted Pech to protect him in the Trust Litigation. After Pech's representation ended, Morgan's new lawyers worked to resolve the case and to secure Morgan's reinstatement as trustee. By the time of his reinstatement, Morgan had paid his new lawyers over $2.4 million.

Morgan's new lawyers—Justin Gold and Scott Bertzyk—also testified regarding Pech's alleged negligence and Morgan's claimed damages. Gold testified it was clear that Pech had failed to advise Morgan not to use Trust assets to pay for his personal defense, and this act of professional negligence was the root cause of all the costly litigation that followed Morgan's suspension and the Hitchmans' appointment. Bertzyk likewise testified that "[a]lmost everything" he had to do in litigating with Shurtleff and the Hitchmans stemmed from Pech's negligence in failing to segregate his fees and later attempting to withhold his invoices. Gold's fees totaled over $580,000; Bertzyk's fees totaled over $1.89 million.

## 5.    *Verdict and Post-Trial Motions*

The jury returned a mixed verdict. It denied relief on Pech's contract claim, finding a valid fee agreement existed but Pech had failed to perform his contractual obligations. However, the jury awarded Pech damages on his quantum meruit and account stated claims, finding the reasonable value of Pech's services and the amount owed on the account was $497,880.90. On Morgan's cross-claim, the jury found Pech had negligently caused Morgan to suffer $323,188.25 in damages.

Both sides filed post-trial motions for new trial and JNOV. The trial court denied Pech's motions and granted Morgan's.

With respect to the quantum meruit claim, the court concluded the jury's finding that a valid fee agreement existed precluded recovery grounded on an implied covenant to pay. As for the account stated claim, the court concluded Pech's evidence was insufficient for two reasons: (a) the undisputed evidence proved Pech's billing statement did not comply with Business and Professions Code section 6148, rendering the statements inadequate to serve as stand-alone contracts to pay; and (b) evidence of Morgan's silence when presented with the bills was insufficient to establish his consent to the amounts stated.

The court entered judgment on the jury's verdict in favor of Morgan on his cross-complaint and Pech's contract claim, and on the court's order granting JNOV with respect to Pech's quantum meruit and account stated claims. Pech filed a timely notice of appeal.

## DISCUSSION

### 1. *The Evidence Did Not Compel a Finding in Pech's Favor on His Superseding Cause Defense*

At trial, Pech primarily contested the causation element of Morgan's professional negligence claim, arguing the Hitchmans' intentional misconduct following their appointment as interim trustees constituted a superseding cause of Morgan's claimed harm. On appeal, Pech contends the trial court erred in denying his JNOV motion because, notwithstanding the jury's verdict, the undisputed evidence compelled a finding in his favor on this affirmative defense.[6] Specifically, Pech argues there is no legal

---

[6] As a general rule, a trial court may grant JNOV "only if the verdict is not supported by substantial evidence." (*Begnal v. Canfield & Associates, Inc.* (2000) 78 Cal.App.4th 66, 72.) Pech, however, had the burden to prove his affirmative defense, and

11

precedent for imposing malpractice liability against an attorney where a court-appointed fiduciary "later looted" a former client's trust.  The argument misses the mark.  Contrary to Pech's premise, Morgan did not seek—and was not awarded—damages on any theory that the Hitchmans looted the trust.

The doctrine of superseding cause absolves a tortfeasor of liability, even where his conduct was a substantial contributing factor in bringing about the plaintiff's harm, "when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible."  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573, fn. 9 (*Soule*); accord *Crouch v. Trinity Christian Center of Santa Ana, Inc.* (2019) 39 Cal.App.5th 995, 1022.)  California has adopted the "modern view" of the doctrine embodied in section 448 of the Restatement Second of Torts: " 'The act of a third person in committing an intentional tort

---

therefore it would be " 'misleading' " to characterize the operative standard as whether substantial evidence supported the jury's verdict.  (*Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960, 965–966; see also *Arreola v. County of Monterey* (2002) 99 Cal.App.4th 722, 760 ["defendant has the burden to prove the affirmative defense of superseding cause"].)  " 'This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case.' " (*Valero,* at p. 965.)  Thus, on appeal (as it was on Pech's JNOV motion) the question is " 'whether the evidence compels a finding in favor of [Pech] as a matter of law.' "  (*Id.* at p. 966.)

12

or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.' " (*Kane v. Hartford Accident & Indemnity Co.* (1979) 98 Cal.App.3d 350, 360.)

As the Restatement's formulation makes clear, the superseding cause defense applies only where the third party's conduct was the immediate cause of the plaintiff's claimed harm, and where the defendant could not reasonably have foreseen the kind and degree of harm that resulted. (*Soule, supra,* 8 Cal.4th at p. 573, fn. 9; see *Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 18 ["Third party [conduct] which is the immediate cause of an injury may be viewed as a superseding cause" when " 'the *risk of harm*' " caused "is so highly extraordinary as to be unforeseeable."].) The defense thus operates at the intersection of causation and foreseeability—it does not arise simply because a third party engaged in independent wrongdoing after the defendant's negligence.

At trial, Pech sought to establish his affirmative defense primarily by introducing verified pleadings Morgan had filed against the Hitchmans seeking to recover damages to the Trust and a group of affiliated business entities the Hitchmans allegedly harmed while serving as interim trustees.[7] As Pech

---

[7] The pleadings are (a) a verified petition in the Trust Litigation that Morgan filed in his capacities as trustee and beneficiary to recover damages incurred by the Trust due to the

recounts in his opening brief, those pleadings alleged the " 'Morgan family business empire' " was " 'depleted by the Hitchmans' tortious actions' "; the Hitchmans regularly " 'abuse their roles as professional fiduciaries to gain access to, and then plunder, the fortunes of families they are supposed to serve' "; and the Hitchmans " 'engaged in this misconduct intentionally, and acted with oppression, fraud and malice.' " (Underlining and italics omitted.)  Pech also elicited testimony from Morgan, Gold, and Bertzyk apparently for the purpose of establishing that Morgan had sued the Hitchmans for—as Pech put it in examining the witnesses—"looting the Trust and taking [Morgan's] inheritance and the family's inheritance as well."

The problem with Pech's argument (and with the case he presented at trial) is Morgan did not ask the jury to award damages for harm to the Trust or to his inheritance.  Rather, Morgan sought to recover the legal fees billed by successor counsel Bertzyk and Gold for—as Bertzyk testified—"cleaning up the mess [Pech] created" when his malpractice caused Morgan to be suspended as trustee.  Morgan's evidentiary presentation at trial was consistent with this theory:  he introduced evidence of the fees he paid to Bertzyk and Gold to position the case for a settlement reinstating him as trustee, but he introduced *no* evidence of the harm the Hitchmans may have caused to

Hitchmans' alleged breach of fiduciary duty; and (b) a verified complaint filed in the Orange County Superior Court by Morgan and several of his business entities that the Hitchmans allegedly harmed through unlawful conversions and interference with business relationships while serving as interim trustees.

14

the Trust or to his inheritance.[8]  Morgan's counsel made the point explicit in closing argument:  We "[d]on't care about all the stuff happening with [the lawsuit against] the Hitchmans"—"[t]hat's for the Hitchmans."  "[O]ur number that we're asking you for [is] just those fees" billed by Bertzyk and Gold—"the legal fees that were caused by Mr. Pech because [Morgan] had to get Justin Gold and Scott Bertzyk to fix all this stuff for [Morgan] to put him back in his family trust."  And, the jury was instructed accordingly:  "The following are the specific items of damages claimed by Thomas E. Morgan, III:  legal fees and costs incurred by the lawyers hired to replace Richard Pech in order to deal with the problems caused by Mr. Pech's wrongful conduct and to restore Mr. Morgan as trustee."

Pech's superseding cause argument fails because it is directed at a damages theory that Morgan never advanced.  Whatever harm the Hitchmans may have inflicted by "subsequently looting the trust," Morgan did not ask the jury to hold Pech responsible for that injury.  The superseding cause defense, as we have explained, operates to sever the causal link between a defendant's negligence and the plaintiff's claimed harm.  Where the plaintiff's claimed harm is the reasonable

_____

[8]     Pech nonetheless questioned Morgan about whether, absent the Hitchmans' conduct, "there would have been more money in the Trust [that] [Morgan] would have received."  Morgan's counsel objected to this line of inquiry on the ground that Pech's questions misstated the pleadings and encroached on the jury instructions.  The trial court overruled the objection, concluding Morgan could "answer how much [was] taken from him, which is different from how much he believes Mr. Pech owes him."  Notably, Pech agreed with the court's formulation, adding, "You paraphrased it better than I did."

15

and foreseeable consequence of the defendant's negligence—here, the legal fees Morgan necessarily incurred to undo the consequences of Pech's malpractice and secure his reinstatement as trustee—the doctrine has no application, regardless of what independent wrongdoing a third party may have committed in the aftermath of the defendant's negligence.

Pech does not address Morgan's actual damages theory, nor does he attempt to demonstrate that he could not reasonably have foreseen that Morgan would incur legal fees to obtain reinstatement after Pech's negligence caused Morgan's suspension. The omission is fatal to Pech's argument. Because Pech has not shown that the evidence compelled a finding in his favor on his superseding cause defense, the trial court did not err in denying his motion for JNOV.

## 2. *The Trial Court Reasonably Exercised Its Discretion to Manage Pech's Pro Per Direct Testimony*

Pech represented himself in propria persona and testified as a witness in support of his fee claims. To manage his direct examination, the trial court ordered Pech to write out his direct examination questions beforehand and to provide the questions to the court and opposing counsel in advance of his testimony. Under the court's adopted procedure, Pech's legal assistant (a nonlawyer) would read the questions aloud, Pech would answer orally, and Morgan's counsel would have the opportunity to object before each answer was given. The court's purpose was to ensure that Pech's direct examination proceeded in an orderly question-and-answer format consistent with the rules of evidence, while accommodating Pech's decision to forgo counsel.

Pech contends the trial court abused its discretion and violated his constitutional right to due process by ordering him

16

to prepare a written "script" of his direct examination questions for the court's and opposing counsel's advance review. He argues the order was unprecedented and unnecessary, and that it subjected him to an awkward and burdensome procedure that no represented party would be required to endure. Pech maintains that, as a self-represented litigant, he was entitled to conduct his own direct examination in the same manner as any attorney examining a witness (i.e., Pech the lawyer should have been permitted to ask Pech the witness questions), and that the trial court's order impermissibly singled him out for disparate treatment. He further contends the order conflicted with established rules governing the conduct of trial by self-represented parties, including the right to present oral testimony. In Pech's telling, the cumulative effect of these deficiencies rendered the script procedure fundamentally unfair and warrants reversal of the judgment, without a showing of prejudice. We disagree.

A trial court has inherent as well as statutory discretion to control the proceedings, including the mode and manner of witness interrogation, to ensure "the efficacious administration of justice." (*People v. Cox* (1991) 53 Cal.3d 618, 700, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22; see Evid. Code, § 765, subd. (a) ["The court shall exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and to protect the witness from undue harassment or embarrassment."]; Code Civ. Proc., § 128, subd. (a)(3) [the court has the power to "provide for the orderly conduct of proceedings before it"].) The court is to be accorded "[c]onsiderable latitude" in managing trial proceedings,

17

and its orders will not be disturbed unless it exceeded the bounds of reason, all of the circumstances before it being considered, "to the prejudice of the appellant[ ]." (*Commercial Union Assur. Co. v. Pacific Gas & Electric Co.* (1934) 220 Cal. 515, 525; *Denham v. Superior Court of Los Angeles County* (1970) 2 Cal.3d 557, 566.) Even where error is established, a judgment may not be reversed unless the appellant demonstrates it resulted in a miscarriage of justice. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800; cf. *In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291 (*Marriage of Carlsson*) [" 'Denying a party the right to testify or to offer evidence is reversible per se.' "].)

We recognize the "script" order was unconventional— particularly the condition requiring Pech to provide his written questions to opposing counsel in advance—but the record does not support Pech's claim that the order deprived him of fundamental due process. *Marriage of Carlsson* is instructive. The husband in that case appealed a judgment of dissolution entered after a bench trial, arguing "the trial court denied him his constitutional right to due process and a fair trial" by ending the trial "in the middle of [the husband's] case-in-chief without giving him an opportunity to complete the presentation of evidence or offer rebuttal evidence." (*Marriage of Carlsson, supra,* 163 Cal.App.4th at p. 290.) The reviewing court agreed, concluding "the court's summary termination of the trial infringed on [the husband's] fundamental right to a full and fair hearing." (*Id.* at p. 291.) Although the trial court's exercise of discretion to "expedite proceedings" normally would be reversable only upon a showing of prejudicial error, the lower court's intervention was " 'reversible per se' " because it deprived the husband of his " 'right to testify or to offer evidence.' " (*Ibid.*)

18

As the *Marriage of Carlsson* court explained, "the judge abruptly ended the trial in the middle of a witness's testimony, prior to the completion of one side's case and without giving the parties the opportunity to introduce or even propose additional evidence. This was reversible error." (*Id.* at p. 292.)

Unconventional as it might have been, the script order did not deprive Pech of his right to testify or to offer evidence. Indeed, Pech does not identify a single question that was excluded from his script, a single subject of testimony he was prevented from addressing due to the script order, or any other concrete limitation the order imposed on the substance of his direct examination.[9] To be sure, he complains the procedure

---

[9] Pech repeatedly asserts that "opposing counsel objected that he was 'not sticking to the script.'" Our review of the record confirms otherwise: it was Pech himself—not Morgan's counsel—who used that phrase. Moreover, the wrangling over the script order that Pech highlights arose almost entirely in the context of a different logistical problem—how to introduce a voluminous number of exhibits without losing the jury's attention—a difficulty that was ultimately resolved (at *Pech's* own suggestion) by a straightforward stipulation. Even then, when Pech expressed concern that he had "lost a lot of testimony" by testifying via script, the trial court promptly clarified: "You haven't lost it forever"; "You're still on the stand"; "I'm definitely not precluding further elaboration of exhibits that are in evidence." Pech responded, "I understand."

Pech's suggestion that the script order deprived him of a fair opportunity to conduct redirect examination fares no better. The record shows that after his cross-examination was completed, Pech had an entire weekend to prepare his redirect. Pech was not denied his right to present testimony or to offer other evidence.

was awkward and burdensome, but procedural inconvenience is not prejudice, let alone structural error that transgresses the right to due process. The Constitution guarantees a fair trial, not a frictionless one. Because the script order did not deny Pech his fundamental right to testify and offer evidence, it is not reversible per se.

Nor can we find a prejudicial abuse of discretion on the record presented. The trial court was confronted with an unusual situation largely of Pech's own making: he chose to represent himself and he chose to testify as a witness in support of his own claim. These circumstances created a genuine procedural complication. By proceeding without counsel, Pech placed the court in the position of having to ensure that his testimony could be taken in a manner that preserved opposing counsel's ability to make timely objections and that protected the integrity of the record presented to the jury.

The script order was a reasonable response to that difficulty. A self-represented litigant is entitled to the same fair treatment as any other party but is not entitled to special dispensation from the court's management of orderly proceedings. (See *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984–985 [self-represented litigants held to same rules of procedure as parties represented by counsel]; *Taylor v. Bell* (1971) 21 Cal.App.3d 1002, 1009 [A lay person who tries his own case "must expect and receive the same treatment as if represented by an attorney—no different, no better, no worse."].) The trial court's order ensured that Pech's direct examination would proceed in a question-and-answer format that gave Morgan's counsel a meaningful opportunity to object before

20

each answer was given—precisely the kind of procedural protection that undergirds the adversarial trial system.

Pech cites a list of rules and authorities he contends establish an abuse of discretion, but none supports his position. He relies on *Elkins v. Superior Court* (2007) 41 Cal.4th 1337 for the proposition that a self-represented litigant must be permitted to testify orally at trial. (See *id*. at p. 1360 [order "calling for the admission and use of declarations at trial" was not permissible to the extent it "conflict[ed] with the hearsay rule"].) But the script order did not deprive Pech of oral testimony—he testified orally, in open court, before the jury. The order governed only the format by which questions were put to him—not the manner in which he answered them. The right to present oral testimony was not abridged.

Pech also cites two federal decisions, neither of which aids him. In *United States v. Beckton* (4th Cir. 2014) 740 F.3d 303, the reviewing court upheld an order requiring a self-represented defendant to testify in question-and-answer format, reasoning the procedure was necessary to afford opposing counsel a fair opportunity to object. (See *id*. at pp. 304–305; see also *id*. at pp. 306–307 ["the district court's refusal to allow [the defendant] to testify in narrative form was not 'arbitrary or disproportionate,' " even though "it may be uncomfortable for a pro se litigant to question himself"].) In *United States v. Nivica* (1st Cir. 1989) 887 F.2d 1110, the reviewing court similarly declined to find error where the trial court required a pro per litigant to pose questions to himself rather than testify in narrative form. (See *id*. at pp. 1120–1123.) While these federal decisions are not binding, they are instructive, and they cut squarely against Pech's position. As we have explained,

21

the trial court's order ensured that Pech's direct examination would proceed in the question-and-answer format necessary "to assure opposing counsel the opportunity to lodge any objection prior to [the witness's] answer." (*Beckton,* at p. 306.)

At bottom, the trial court balanced Pech's right to present his direct testimony orally against Morgan's right to make timely objections and the court's interest in maintaining an orderly and intelligible record. The script order struck that balance reasonably. Pech does not identify any instance in which he was prevented from presenting testimony he wished to offer. He has not shown a prejudicial abuse of discretion.

3.      ***The Trial Court Reasonably Exercised Its Discretion to Exclude Pech's Undisclosed Expert***

Pech contends the trial court abused its discretion by granting Morgan's motions in limine to exclude his proposed expert from testifying on the reasonableness of Pech's fees and the standard of care applicable to Morgan's malpractice cross-claim. The trial court excluded the proposed expert on the ground that Pech failed to make an expert disclosure in response to Morgan's exchange demands. Pech argues the demands were untimely and therefore could not serve as a valid basis for exclusion. We disagree.

A party may not present expert witness testimony at trial if he has unreasonably failed to comply with the statutory expert disclosure requirements. (Code Civ. Proc., § 2034.300.) Exclusion of undisclosed expert testimony is compelled by both the statute and fundamental fairness: "When an expert is permitted to testify at trial on a wholly undisclosed subject area, opposing parties . . . lack a fair opportunity to prepare for cross-

22

examination or rebuttal." (*Bonds v. Roy* (1999) 20 Cal.4th 140, 147.)

The procedures governing the exchange of expert witness information are keyed to the initial trial date. (See Code Civ. Proc., § 2034.220.) A trial court may order disclosure at a later date, as commonly occurs when a trial continuance carries forward the statutory deadlines tied to the new trial date. (*See id.*, §§ 2024.020, subd. (b); 2024.050.) Critically, the Discovery Act does not provide for objections to an expert demand. A party that believes a demand for expert exchange is untimely must move for a protective order quashing the demand. (See *id.*, § 2034.250, subd. (b)(1).) Our authorities on this point are uniform: a party served with an expert demand must either designate experts in conformity with the demand or seek a protective order—he may not simply ignore the demand. (See *Cottini v. Enloe Medical Center* (2014) 226 Cal.App.4th 401, 419 (*Cottini*); *Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1112 (*Zellerino*) ["The Legislature did not provide for objections to demands for exchanges of experts. . . . [¶] . . . Each of the standard treatises on discovery describe[s] the procedure for obtaining a protective order once a demand for exchange of experts has been made: None mentions the possibility of filing an objection."].)

Pech contends Morgan's expert exchange demands were untimely because they were served in May and August 2021—more than fourteen months after the deadline tied to the original trial date of May 14, 2020. Although the court continued the trial date several times, Pech argues the court did not reopen discovery until it entered an October 18, 2021 minute order providing: "Only the expert witness discovery cut-off date shall

23

follow the new trial date.  All other statutory cut-off dates are not continued."  Because Morgan did not serve a new expert demand after that order, Pech maintains the earlier demands were nullities that could not support exclusion of his expert.  Rather than comply with Morgan's demands or seek a protective order, Pech served an objection to the demand and otherwise declined to disclose his expert.

Even if Pech's timeliness objection had merit, his failure to disclose his proposed expert was nonetheless improper.  Pech's remedy for an untimely expert demand was to move for a protective order—not to serve a unilateral objection and treat the demand as a nullity.  (See Code Civ. Proc., § § 2034.250, subd. (b)(1); *Cottini, supra,* 226 Cal.App.4th at p. 419; *Zellerino, supra,* 235 Cal.App.3d at p. 1112.)  As Morgan correctly frames the issue, Pech had two options when faced with the demand for exchange of experts:  either make the disclosure or seek relief from the court.  He chose neither.  That choice was an unreasonable failure to comply with the expert disclosure procedures and warranted exclusion of the proposed expert's testimony under Code of Civil Procedure section 2034.300.

Notably, Pech does not challenge or otherwise attempt to distinguish *Cottini* or *Zellerino* in his reply brief.  He offers only the assertion that the issue "does not need further argument."  The concession speaks for itself.  The trial court did not abuse its discretion in excluding Pech's undisclosed expert.

4.  ***The Trial Court Correctly Granted Morgan's Motion for JNOV***

The jury returned a verdict in favor of Pech on his quantum meruit and account stated claims, awarding him $497,880 as both the reasonable value of the services rendered

24

and the stated amount that Morgan promised to pay on the account.  The trial court granted JNOV as to both claims. Pech challenges the ruling with respect to the account stated cause of action only.[10]  He contends the trial court ignored controlling Supreme Court authority recognizing that an attorney's billing statements can, like any other bill, serve as the basis for an account stated.  (See *Crane v. Stansbury* (1916) 173 Cal. 631, 636 (*Crane*); *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 25 (*Trafton*).)  While Pech is correct that an attorney's bill may, under proper circumstances, support an account stated claim, the authorities he cites do not conflict with the trial court's ruling—on the contrary, *Trafton* compels the conclusion the court reached.

A trial court must grant JNOV "if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th

---

[10]    The trial court granted JNOV on the quantum meruit claim, concluding Pech could not obtain relief on an implied-in-law promise to pay reasonable value when the jury had found the parties had an actual agreement covering compensation under which Pech had failed to perform.  (See *Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1419–1420 ["equitable entitlement to a quantum meruit payment is not implied where the parties have actual contract terms covering payment"; thus, where "trial court made a factual finding that the parties had formed an actual, not an implied, contract" and also found that "the condition precedent to payment had . . . not been satisfied," plaintiff was not entitled to quantum meruit relief].)  Pech does not challenge this ruling.

62, 68.)  We review the ruling de novo, applying the same standard as the trial court.  (*Ibid.*)

"An account stated is an agreement, based on prior transactions between the parties, that all items of the account are true and that the balance struck is due and owing from one party to the other."  (*Trafton, supra,* 69 Cal.2d at p. 25.) " 'The bill of an attorney for services, like any other bill, may under proper circumstances and conditions be the subject of an account stated.' "  (*Ibid.*, quoting *Crane, supra,* 173 Cal. at p. 636.)  The agreement underlying an account stated need not be express; it may be implied from the circumstances, including a debtor's failure to object to a statement of account within a reasonable time.  (*Trafton*, at p. 25.)  However, because accounts stated "were 'intended to preserve and protect legitimate demands but not to create obligations independent of prior indebtedness,' " the rendering of an account, even one to which the alleged debtor has not objected, "cannot create a liability where no liability existed before."  (*Id.* at p. 26.)

The trial court granted Morgan's motion challenging the account stated verdict on two independent grounds. First, relying on *Leighton v. Forster* (2017) 8 Cal.App.5th 467 (*Leighton*), the court reasoned that Pech's periodic billing statements could not serve as " 'stand-alone attorney fee agreement[s]' " because they did not comply with the requirements of Business and Professions Code section 6148 —among other deficiencies, they were not signed by Morgan and did not identify costs and expenses incurred.  (See *Leighton,* at p. 494; Bus. & Prof. Code, § 6148, subds. (a) & (b).)[11]  Second,

_____

[11]     Business and Professions Code section 6148 regulates the form and content of fee agreements that do not involve a

26

and independently, the court concluded, "even had Morgan not objected to the bills, that does not satisfy Pech's burden of showing consent." (See *Zinn v. Fred R. Bright Co.* (1969) 271 Cal.App.2d 597, 600 (*Zinn*) ["The essential elements of an account stated are: (1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due."].)

On appeal, Pech exclusively challenges the trial court's reliance on *Leighton.* He argues *Leighton* is inapposite because, unlike in that case, the jury here found that a fee agreement complying with Business and Professions Code section 6148 existed between the parties. (Cf. *Leighton, supra,* 8 Cal.App.5th at p. 494 [rejecting argument that invoice constituted "a stand-alone attorney fee agreement as well as a statement of her account" where invoice did "not comply with the requirements of section 6148," and there otherwise was "insufficient evidence" of "the existence of a written attorney fee agreement"].) In Pech's telling, the existence of a compliant fee agreement renders the *Leighton* court's analysis beside the point, and *Trafton* and *Crane* are therefore controlling—standing, as they do, for the

---

contingency fee. (*Pech v. Morgan* (2021) 61 Cal.App.5th 841, 850.) Its purpose is to ensure that " 'clients are informed of and agree to the terms by which the attorneys who represent them will be compensated.' " (*Ibid.*) "The '[f]ailure to comply with any provision of [section 6148] renders the agreement voidable at the option of the client, and the attorney shall, upon the agreement being voided, be entitled to collect a reasonable fee.' " (*Ibid.,* quoting Bus. & Prof. Code, § 6148, subd. (c).)

proposition that an attorney's billing statements, like any other bills, may support an account stated claim under the right circumstances. (See *Trafton, supra,* 69 Cal.2d at p. 25; *Crane, supra,* 173 Cal. at p. 636.) Pech does not, however, address the trial court's independent conclusion that Morgan's silence in the face of Pech's billing statements was insufficient, as a matter of law, to establish the consent element of Pech's account stated claim. We conclude this independent ground for granting JNOV was consistent with—and, indeed, compelled by—our high court's holding in *Trafton.*

As discussed, an account stated claim is meant to " 'preserve and protect legitimate demands' "—it is not a mechanism for creating obligations " 'independent of prior indebtedness.' " (*Trafton, supra,* 69 Cal.2d at p. 26.) Here, the jury found Pech failed to perform his contractual obligations under the fee agreement with Morgan and, thus, Pech had no legitimate preexisting demand under the contract for the fees reflected in his billing statements. Because an account stated cannot conjure a valid claim out of a demand the claimant had no legal right to make, "the rendering of an account, [even if] not objected to, cannot create a liability where no liability existed before." (*Ibid.*)

*Trafton* is controlling on this point. There, our Supreme Court rejected an attorney's contention that his client's two-year silence in the face of a statement of account constituted implied consent to the amounts stated. (See *Trafton, supra,* 69 Cal.2d at pp. 20–21, 25–26.) The trial court had found there was no agreement fixing the attorney's fee, and thus the "amount shown in the statement as a 'balance due' did not represent a preexisting liability" supporting an account stated claim. (*Id.*

28

at p. 26.)  Our Supreme Court agreed.  While the *Trafton* court acknowledged "an attorney is entitled to recover the reasonable value of his services if there is no express employment contract providing for his compensation," it emphasized an attorney " 'may not unilaterally determine his own fee . . . without the knowledge or consent of the client.' "  (*Ibid*.)  Nor could the attorney "circumvent this obstacle" by proffering the client's "failure to object to the statement of account . . . as an assent to pay the amount therein specified."  (*Id.* at p. 27.)  To imply consent from the client's silence, our high court explained, "would be to permit the creation of the obligation by the rendering of the account 'independent of prior indebtedness.' "  (*Ibid*.)

The same reasoning applies here.  The jury found Pech failed to perform his contractual obligations and was therefore entitled to nothing under the fee agreement.  But even assuming Pech had some entitlement to the reasonable value of the services he rendered, *Trafton* is clear that he could not unilaterally determine what that value was, state it in a bill to Morgan, and then rely on Morgan's silence as implied consent to it.  By claiming Morgan's failure to object to his billing statements amounted to acquiescence in the amounts stated in them, Pech was doing precisely what *Trafton* forbids—attempting to fix his own fee and create an obligation by the rendering of an account independent of any legitimate prior indebtedness.  (*Trafton, supra,* 69 Cal.2d at pp. 26–27.)  The trial court correctly concluded evidence of Morgan's silence was insufficient to establish his agreement to the amount Pech claimed was due.

(See *Zinn, supra,* 271 Cal.App.2d at p. 600.)  The court properly granted JNOV.[12]

## DISPOSITION

The judgment is affirmed.  Thomas E. Morgan III is entitled to costs.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.

We concur:



EDMON, P. J.



ADAMS, J.

---

[12]     Because we conclude Pech was not entitled to damages on his account stated claim and Pech does not challenge the jury's verdict on his contract claim or the trial court's grant of JNOV on his quantum meruit claim, we need not address his contention that the court erred by admitting evidence offered to offset the amount of his fee claims.